## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>COACH AM GROUP HOLDINGS CORP., _et al._.[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 12-_____(___)<br><br>(Joint Administration Requested) |

## DECLARATION IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Brian E. Cejka, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the Chief Restructuring Officer for the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**").

2.     As a result of my involvement with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team and the Debtors' professionals, I am familiar with the Debtors' business, financial

---

[1]     Coach Am Group Holdings Corp. (4830); Coach Am Holdings Corp. (1816); Coach America Holdings, Inc. (2841); American Coach Lines, Inc. (2470); America Charters, Ltd. (8246); American Coach Lines of Atlanta, Inc. (4003); American Coach Lines of Jacksonville, Inc. (1360); American Coach Lines of Miami, Inc. (7867); American Coach Lines of Orlando, Inc. (0985); Coach America Group, Inc. (2816); B & A Charter Tours, Inc. (9392); Dillon's Bus Service, Inc. (5559); Florida Cruise Connection, Inc. (9409); Hopkins Airport Limousine Services, Inc. (1333); Lakefront Lines, Inc. (5309); The McMahon Transportation Company (0030); Midnight Sun Tours, Inc. (2791); Royal Tours of America, Inc. (2313); Southern Coach Company (6927); Tippet Travel, Inc. (8787); Trykap Airport Services, Inc. (0732); Trykap Transportation Management, Inc. (2727); KBUS Holdings, LLC (6419); ACL Leasing, LLC (2058); CAPD, LLC (4454); Coach America Transportation Solutions, LLC (6909); CUSA, LLC (3523); CUSA ASL, LLC (2030); CUSA AT, LLC (2071); CUSA AWC, LLC (2084); CUSA BCCAE, LLC (2017); CUSA BESS, LLC (3610); CUSA CC, LLC (1999); CUSA CSS, LLC (1244); CUSA EE, LLC (1982); CUSA ELKO, LLC (4648); CUSA ES, LLC (1941); CUSA FL, LLC (1920); CUSA GCBS, LLC (1891); CUSA GCT, LLC (1833); CUSA KBC, LLC (1808); CUSA K-TCS, LLC (1741); CUSA Leasing, LLC (1321); CUSA PCSTC, LLC (1701); CUSA PRTS, LLC (1591); CUSA RAZ, LLC (0640); CUSA Transit Services, LLC (8847); Get A Bus, LLC (1907); Coach BCCAE, L.P. (3488); Coach Leasing BCCAE, L.P. (6784).  The Debtors' corporate offices are located at 8150 North Central Expressway, Suite M1000, Dallas, Texas 75206.

condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, professionals, or retained advisers that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code (as defined below), the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession.

4.      I submit this Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of the Bankruptcy Code and (b) "first day" motions, which are being filed contemporaneously with the voluntary petitions (collectively, the "**First Day Motions**"). The Debtors seek the relief set forth in the First Day Motions in order to minimize the impact of the commencement of these chapter 11 cases on their business as well as to ensure a smooth transition into chapter 11 for the Debtors' employees, customers, and vendors and suppliers. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my conclusion that the relief sought in each First Day Motion is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of these chapter 11 cases.

5.      Part I of this Declaration provides an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings. Part II sets forth the relevant facts in support of the First Day Motions.

## PART I

### A.   Business Overview

6.     The Debtors operate the largest tour and charter bus service and the second largest motorcoach service in the United States.  The Debtors operate primarily under the well-recognized Coach America, CUSA, American Coach Lines and Gray Line brands.  Services provided by the Debtors include motorcoach charters, tours and sightseeing, commuter transportation, airport and casino shuttles, rail crew transportation and contract services for municipalities and corporations. The Debtors' fleet consists of over 3,000 well maintained vehicles, including 1,623 full size motor coaches, 351 minibuses and cutaways, 902 vans and 39 trolleys.

7.     The Debtors employ approximately 6,000 people and have a monthly payroll of approximately $13.8 million.

### B.   Prepetition Indebtedness And Capital Structure

8.     As discussed in the First Day Declaration, as of the Petition Date, the Debtors had outstanding secured debt obligations in the aggregate principal amount of approximately $388,752,806 including approximately $318,729,664 in first lien debt arising under the Prepetition First Lien Credit Agreement (as defined below), $30,500,000 in second lien debt arising under the Prepetition Second Lien Credit Agreement (as defined below) and approximately $39,523,141 owed to certain capital lessors who are secured by liens over certain of the Debtors' capital assets.

9.     In addition, the Debtors' unsecured obligations (including trade and other claims) as of the Petition Date total at least $15 million.[2]

---

[2]     Nothing contained herein constitutes an admission or acknowledgment that any claims described and identified in this Declaration are valid, enforceable, allowable, or not subject to disputes, counterclaims, or offsets.

        **(i)**      **First Lien Credit Facility**

10.      Prior to the Petition Date, the Debtors entered into that certain Amended and Restated First Lien Credit Agreement dated as of April 20, 2007 and amended and restated as of February 18, 2011 (as heretofore amended, supplemented or otherwise modified, the "**Prepetition First Lien Credit Agreement**") by and among Coach America Holdings, Inc., as the borrower, and the other Debtors as guarantors, the lenders from time to time a party thereto (the "**Prepetition First Lien Lenders**") and JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent for the Prepetition First Lien Lenders (the "**Prepetition First Lien Agent**").  Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders agreed to extend certain loans to and issue letters of credit including (a) a term loan in the aggregate principal amount of  $245 million (b) a funded letter of credit commitment in the aggregate amount of $50 million and (c) a revolving credit facility in the aggregate principal amount of up to $30 million, which includes a $10 million subfacility for revolving letters of credit.

11.      As of the Petition Date, the Debtors were indebted and liable to the Prepetition First Lien Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $238,346,317.36 in respect of term loans made, in the aggregate principal amount of approximately $24,383,347.39 in respect of revolving loans made, in the aggregate face amount of approximately $6 million in respect of revolving letters of credit issued and outstanding and in the aggregate face amount of approximately $50 million in respect of funded letters of credit issued and outstanding, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Existing First Lien Agreements), charges and other obligations incurred in connection therewith as provided in the Existing First Lien Agreements (as defined below) (collectively, the "**Prepetition First Lien Debt**"), in each case pursuant to, and in accordance with the terms of the Existing First Lien Agreements.

12.    The First Lien Debt is secured by first priority liens on and continuing security interests in (the "**Prepetition First Priority Liens**") substantially all of the Debtors' assets (excluding real property) (collectively, the "**Prepetition Collateral**") pursuant to that certain Amended and Restated First Lien Guarantee and Collateral Agreement dated as of April 20, 2007 as amended and restated as of February 18, 2011 (collectively with the Pre-Petition First Lien Credit Agreement, and the mortgages and all other documentation executed in connection therewith (including, for the avoidance of doubt, any Specified Hedge Agreements (as defined in the Prepetition First Lien Credit Agreement), if any), the "**Existing First Lien Agreements**").

(ii)    **Second Lien Credit Facility**

13.    Prior to the Petition Date, the Debtors entered into that certain Amended and Restated Second Lien Credit Agreement dated as of April 20, 2007 and amended and restated as of February 18, 2011 (as heretofore amended, supplemented or otherwise modified, the "**Prepetition Second Lien Credit Agreement**" and together with the Prepetition First Lien Credit Agreement, the "**Prepetition Credit Agreements**") by and among Coach America Holdings, Inc., as the borrower and the other Debtors as guarantors, the lenders from time to time a party thereto (the "**Prepetition Second Lien Lenders**") and The Bank of New York Mellon ("**BONY**") in its capacity as administrative agent and collateral agent (the "**Prepetition Second Lien Agent**" and together with the Prepetition Second Lien Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders, the "**Prepetition Secured Parties**").  Pursuant to the Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Lenders agreed to extend a term loan in the aggregate principal amount of $55 million.  As of the Petition Date, the Debtors owe approximately $30.5 million with respect to the term loan under the Prepetition Second Lien Credit Agreement plus accrued and unpaid interest thereon and all other liabilities and obligations arising out of or in connection with the Prepetition Second Lien Credit Agreement (collectively, the "**Prepetition Second Lien Debt**" and together with the Prepetition

First Lien Debt, the "**Prepetition Debt**").  The Second Lien Debt is secured by second priority liens on and security interests in (the "**Prepetition Second Priority Liens**") the Prepetition Collateral pursuant to that certain Second Lien Guarantee and Collateral Agreement dated as of April 20, 2007 and amended and restated as of as of February 18, 2011 among Holdings, as the Borrower, each subsidiary party thereto and BONY, as collateral agent (as heretofore amended, supplemented or otherwise modified and, collectively with the Prepetition Second Lien Credit Agreement, and the mortgages and all other documentation executed in connection therewith, the "**Existing Second Lien Agreements**" and, together with the Existing First Lien Agreements, the "**Existing Agreements**")

### (iii)    Intercreditor Agreement

14.    Pursuant to that certain Amended and Restated Intercreditor Agreement dated as of April 20, 2007, as amended and restated as of February 18, 2011 (the "**Intercreditor Agreement**"), among other things, the Second Priority Liens are subject and subordinate to the First Priority Liens on the terms set forth in the Intercreditor Agreement.

### (iv)    Unsecured Obligations

15.    As of the Petition Date, the Debtors collectively have at least $15 million in outstanding obligations to trade vendors and other creditors.

### (v)    The Debtors' Equity Interests

16.    Debtor Coach AM Group Holdings Corp. is the parent of Debtor Coach AM Holdings Corp., which in turn is the parent of Debtor Coach America Holdings, Inc., which is the parent of each of the other Debtors. The equity of Debtor Coach AM Group Holdings Corp. is owned by non-debtor Coach America Group Holdings, II, L.P. This entity is a direct subsidiary of non-debtor Coach America Group Holdings, L.P., which is the ultimate parent company of each of the Debtor and non-debtor entities that are part of the "Coach America" family of companies.

C.      **Debtors' Recent Financial Performance**

17.     For the fiscal year ended December 31, 2010, the Debtors reported net revenues of approximately $433 million and a net loss of approximately $180 million.  For the eleven-months ended November 30, 2011, the Debtors reported net revenues of approximately $417 million and a net loss of approximately $27 million.   As of November 30, 2011, the Debtors' reported assets of approximately $274 million on their consolidated balance sheet and liabilities of approximately $402 million.

D.      **Events Leading To Commencement of the Chapter 11 Cases**

18.     The Debtors business are operationally sound, but it has suffered from the economic downturn that began in late 2008 and liquidity constraints.  Specifically, debt service requirements, covenant restrictions and increased insurance costs (primarily relating to insurance renewals) have placed acute pressure on the Debtors' liquidity.  These liquidity constraints have caused the Debtors to defer capital improvements.

19.     The Debtors are in need of financial restructuring due to the impending issues with the First Lien Credit Facility. For several months prior to the Petition Date, the Debtors, in conjunction with their financial and legal advisors, have been exploring financial restructuring alternatives, including negotiations with the First Lien Agent over the terms of a restructured credit facility.  These negotiations have been unsuccessful to date.

20.     Accordingly, the Debtors took the unfortunate but necessary step of filing their voluntary petitions to protect, preserve and maximize the value of their business and assets.  Through these chapter 11 cases, the Debtors intend to restructure their debt obligations to enable them to satisfy the claims of the Prepetition Secured Parties, vendors and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code.

## PART II

21.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions. The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

22.     For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this Part II but not otherwise defined herein shall have the meaning ascribed to them in the relevant First Day Motion.

**A.     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C.§§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C.§ 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c) ("<u>DIP</u> <u>Financing</u> <u>Motion</u>")**

23.     The Debtors generate cash from the use of the assets pledged in connection with the Prepetition Credit Agreements.  The Debtors use Cash Collateral in the ordinary course of their business to finance their operations and fund working capital, capital expenditures and for other general corporate purposes.  It is imperative that the Debtors obtain authority to use Cash Collateral to meet their working capital needs.  The inability to use these funds during these Chapter 11 Cases would cripple the Debtors' business operations.  Indeed, the Debtors must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs, all of which are necessary to preserve and maximize the Debtors' going concern value for the benefit of all stakeholders.

24.     However, the Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate in the ordinary course of business.  Accordingly, the Debtors, with the assistance of their advisors, explored debtor in possession financing

opportunities. Based on such efforts the Debtors determined that the First Lien Lenders were willing to provide post-petition financing (and consent to the use of Cash Collateral) on more favorable terms that any other reasonably available alternative. Accordingly, the Debtors began negotiating with the First Lien Lenders regarding the terms of a post-petition DIP facility.

25. Given the Debtors' existing capital structure and financial condition, the Debtors were unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.

26. Accordingly, after good faith arm's-length negotiations with respect to the terms and conditions of the DIP Facility, Debtor Coach America Holdings, Inc., on behalf of itself and its Debtor subsidiaries, entered into that certain Superpriority Debtor-in-Possession Revolving Credit Facility Term Sheet (the "**DIP Term Sheet**") dated as of December 30, 2011, the terms of which are embodied in the DIP Credit Agreement. The material terms of the DIP Facility are summarized below.

> *Borrower:* Coach America Holdings, Inc.
>
> *Guarantors*: Coach Am Holdings Corp. and each direct and indirect Debtor-subsidiary of the Borrower (each, a "**Guarantor**" and together with the Borrower, the "**Loan Parties**").
>
> *DIP Lenders*: JPMorgan Chase Bank, N.A., as DIP Agent, and the lenders from time to time a party thereto.
>
> *Lead Arranger and Bookrunner:* J.P. Morgan Securities LLC
>
> *Structure and Amount of Financing:* Subject to the terms and conditions of the DIP Credit Agreement, the DIP Lenders agree to make available, in an aggregate principal amount at any time outstanding up to but not exceeding $30 million on a revolving basis for the Debtors' use and upon the Debtors' request. DIP Credit Agreement § 3.1(a); Interim Order ¶5.a.
>
> *Use of Proceeds:* The proceeds of the DIP Loans shall be used in accordance with the DIP Credit Agreement and the Approved Budget (as defined in the DIP Credit Agreement) as approved by the Required Lenders (as defined in the DIP

Credit Agreement) (with respect to the Initial Approved Budget (as defined in the DIP Credit Agreement)), the DIP Agent (with respect to all Approved Budgets submitted for approval after the Initial Approved Budget) or by order of this Court.  DIP Credit Agreement §§ 3.9, 5.16; Interim Order ¶18.e.

***Interest Rate***:  The Borrower may elect that the DIP Loans comprising each borrowing shall bear interest at a rate per annum equal to:  (A) 5.00% plus the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City, (ii) the federal funds effective rate then in effect plus 0.50% and (iii) the Adjusted LIBO Rate (as defined below) applicable for a one month interest period plus 1.00% *or* (B) 6.00% plus the greater of (i) 1.50% and (ii) the rate at which eurodollar deposits in the London interbank market for one month are quoted on the applicable Reuters screen, as adjusted for statutory reserve requirement for eurocurrency liabilities ((i) and (ii) collectively, the "**Adjusted LIBO Rate**").  While any Event of Default set forth in Section 9.1 of the DIP Credit Agreement has occurred and is continuing, the Borrower shall pay the applicable interest rate plus an additional 2.00% per annum on the principal amount of all of its outstanding Obligations (as defined in the DIP Credit Agreement).  DIP Credit Agreement §§1.1, 3.1, 3.2, 4.3, 4.5.

***Revolving Termination Date***:  The earliest to occur of (a) The earliest to occur of (a) the nine-month anniversary of the Effective Date (b) the acceleration of the Revolving Loans and the termination of the Revolving Commitments pursuant to section 9.1 of the DIP Credit Agreement, (c) the day that is 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such 30-day period and (d) the earlier to occur of (i) a sale of all or substantially all of the Borrower's assets or (ii) the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of one or more Reorganization Plans pursuant to an order entered by the Bankruptcy Court.  DIP Credit Agreement §1.1, 3.1.

***Events of Default***:  Events of default under the Financing are identified in Section 9.1 of the DIP Credit Agreement.

***DIP Superpriority Administrative Expense Claims***:   To secure the DIP Obligations, the DIP Agent and DIP Lenders shall be granted allowed superpriority administrative expenses claims (the "**DIP Superpriority Administrative Expense Claims**") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases, having priority over any and all other claims against the Debtors.  Further, the DIP Superpriority Administrative Expense Claims shall be subject and subordinate in priority of payment only to payment of the Carve-Out.  DIP Credit Agreement §3.10; Interim Order ¶6.a.

***DIP Liens***:  To secure the DIP Obligations, the Interim Order provides for the benefit of the DIP Agent and the DIP Lenders liens (the "**DIP Liens**") as follows:

- ***First Lien on Cash Balances and Unencumbered Property***.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable and fully perfected first priority senior security interests in and liens upon all of the prepetition and post-petition property of the Debtors, whether consisting of real, personal, tangible or intangible property (including all of the outstanding shares of capital stock of subsidiaries), in each case that is not subject to valid, perfected and non-avoidable liens (collectively, the "**Unencumbered Property**"), excluding Avoidance Actions but, subject only to and effective upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise;

- ***Lien Priming Prepetition Lenders' Liens***.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors that is subject to the existing liens presently securing the Prepetition Debt (the "**Primed Prepetition Liens**") which shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Agent, and which senior priming liens in favor of the DIP Agent shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection of the Primed Prepetition Liens but shall not prime liens, if any, to which the primed Prepetition First Priority Liens are subject at the time of the commencement of the Chapter 11 Cases or thereafter as may be permitted pursuant to section 546(c) of the Bankruptcy Code; and

- ***Lien Junior to Certain Other Liens***. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the property described above), that is subject to (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or (y) valid and non-avoidable liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, on a junior priority basis in each case excluding liens securing any outstanding debt under the Prepetition Credit Agreements which excluded liens shall be primed as set forth above (together with the assets described in this clause (k), the "**DIP Collateral**").

- The Debtors highlight for the Court that the DIP Collateral excludes Avoidance Actions but, subject only to and effective upon entry of the Final Order, shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.

As set forth in the Interim Order, the DIP Liens shall be subject in each case to the Carve Out.  For purposes hereof, the Carve Out means: (x) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (y) in the event of the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement and after the first business day following delivery of notice (the "**Carve Out Notice**") thereof to the U.S. Trustee, the lead and local counsel for the Debtors and the lead counsel for the official committee of unsecured creditors (once appointed, the "**Creditors' Committee**"), to the extent allowed by the Court at any time, whether before or after delivery of a Carve Out Notice, the payment of accrued and unpaid fees, costs and expenses of professionals retained by the Debtors or the Creditors' Committee (but excluding fees, costs and expenses of third party professionals employed by such Creditors' Committee members) (collectively, "**Professional Fees**") incurred prior to the first business day following the delivery of the Carve Out Notice and (z) Professional Fees incurred on or after the first business day following the delivery of the Carve Out Notice in an aggregate amount not exceeding $600,000 (the "**Carve Out Cap**"), which amount may be used subject to the terms of the Order. For the avoidance of doubt, the dollar limitation on Professional Fees in this clause (z) shall neither be reduced nor increased by the amount of any compensation or reimbursement of Professional Fees incurred, awarded or paid prior to the delivery of a Carve Out Notice, and nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (x), (y) and (z) above.  DIP Credit Agreement §§1.1 and 3.10; Interim Order ¶6.b.

***Fees***:  The DIP Credit Agreement sets forth a Commitment Fee that shall be calculated at the rate of 1% per annum on the average daily amount of the unused Financing, payable monthly in arrears.[3]  DIP Credit Agreement §§1.1 and 3.5; Interim Order ¶5.b.iii.

***Limitation on Charging Expenses Against Collateral***: Upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor case at any time shall be surcharged against the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior written consent

---

[3]   Certain additional fees are set forth in the separate confidential letter agreements entered into in connection with the Financing, which the Debtors are seeking authority to file with the Court under seal.

of the DIP Agent or the Prepetition First Lien Agent and no such consent shall be implied.  Interim Order ¶9.

***Carve-Out***:  As set forth in subsection (l) above, the DIP Liens are subject to the Carve-Out.  DIP Credit Agreement §3.10; Interim Order ¶6.b.

***Adequate Protection***:  The Prepetition First Lien Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral to the extent that there is a diminution in the value of the collateral securing such obligations from and after the Petition Date.  Interim Order ¶12.

> As adequate protection for the interests of the Prepetition First Lien Lenders in the Prepetition Collateral (including Cash Collateral) the Debtors have agreed, among other things, to provide the Prepetition First Lien Lenders the following (the "**Senior Adequate Protection Obligations**"):

- ***Senior Adequate Protection Liens***.  Valid, perfected, post-petition security interests in and liens on (the "**Senior Adequate Protection Liens**") all of the DIP Collateral, *provided, however*, that, notwithstanding anything to the contrary, the Senior Adequate Protection Liens shall only be and remain subject and subordinate to (i) payment of any DIP Obligations and/or the DIP Liens on account thereof, (ii) during the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), payment of the Carve-Out; and

- ***Senior Superpriority Administrative Expense Claims***.  Superpriority administrative expense claims with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "**Senior Superpriority Administrative Expense Claim**"); *provided, however*, that the Senior Superpriority Administrative Expense Claim shall be subordinate only to the DIP Superpriority Administrative Claim and the Carve-Out; *provided, further*, that the Primed First Lien Parties shall not receive or retain any payments, property or other amounts in respect of the Senior Superpriority Administrative Claim or the Existing First Lien Agreements unless and until the DIP Obligations have been paid indefeasibly in cash in full and shall not take any actions to foreclose on the liens in respect of the Senior Superpriority Administrative Claim so long as the DIP Obligations are outstanding.  DIP Credit Agreement §8.3(m).

- ***Fees and Expenses.***  In accordance with sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition First Lien Agent shall receive the payment of all fees and expenses payable to the Prepetition First Lien Agent under the Existing First Lien Agreements and the continuation of such payments provided for thereunder as set forth in paragraph 12.c of the Interim Order.

- ***Monitoring of Collateral***.  The Prepetition First Lien Lenders shall be permitted to retain one financial advisory firm at the expense of the Debtors, which advisory firm shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the Collateral.

- ***Information***.  The Debtors shall provide the Pre-Petition First Lien Agent with any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders.

  Further, the Prepetition Second Lien Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral to the extent that there is a diminution in the value of the collateral securing such obligations from and after the Petition Date.  Interim Order ¶12.c

  As adequate protection for the interests of the Prepetition Second Lien Lenders in the Prepetition Collateral the Debtors have agreed, among other things, to provide the Prepetition Second Lien Lenders the following (the "**Junior Adequate Protection Obligations**"):

- ***Junior Superpriority Administrative Expense Claims.***  Superpriority administrative expense claims with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "**Junior Superpriority Administrative Expense Claim**"); *provided, however*, that the Junior Superpriority Administrative Expense Claim shall be subordinate only to the DIP Superpriority Administrative Claim, the Carve-Out and the Senior Superpriority Administrative Expense Claim; *provided, however*, that the Prepetition Second Lien Agent and Prepetition Second Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the Second Lien Superpriority Administrative Claim or the Existing Second Lien Agreements unless and until the DIP Obligations have indefeasibly been paid in cash in full and shall not take

any actions to foreclose on the liens in respect of the Junior Superpriority Administrative Claim so long as the DIP Obligations are outstanding.  DIP Credit Agreement §8.3(m).

- ***Junior Replacement Liens***.    Valid, perfected, post-petition security interests in and liens on (the "**Junior Replacement Liens**") all of the DIP Collateral, *provided, however*, that, notwithstanding anything to the contrary, the Junior Replacement Liens shall only be and remain subject and subordinate to (i) payment of any DIP Obligations and/or the DIP Lenders' Liens on account thereof; (ii) during the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), payment of the Carve-Out; and (iii) the Senior Adequate Protection Liens in accordance with the Prepetition Intercreditor Agreement.

***Releases.***  The Debtors have agreed to release and be barred from bringing, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Prepetition First Lien Lenders, the Prepetition First Lien Agent and their respective affiliates, agents, officers, directors, employees and attorneys. Interim Order ¶3.

***Indemnification.*** The Debtors have agreed to the Indemnification provisions set forth in the DIP Credit Agreement. DIP Credit Agreement §§ 4.11, 11.5.

***Significant Milestones.***  The Debtors have agreed to (i) file a motion on or prior to January 13, 2012 seeking approval by the Bankruptcy Court of bidding procedures to facilitate the sale of substantially all of the Debtors' assets, and to obtain an order from the Bankruptcy Court with respect thereto on or prior to February 2, 2012; and (ii) prior to May 1, 2012, either commence solicitation of votes on a plan of reorganization pursuant to a disclosure statement approved by the Bankruptcy Court or obtain an order from the Bankruptcy Court approving the sale of all or substantially all of its assets, which sale has the written support of the Administrative Agent, the Required Lenders and the Required Prepetition First Lien Lender Group.  DIP Credit Agreement §§7.16, 9.1(t), 9.1(u).

***Determination of Validity of Prepetition First Lien Lenders' Claims***.  Interim Order ¶¶3.a and 3.b.

***Automatic Stay.***  The automatic stay is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise remedies upon the occurrence of an Event of Default.  DIP Credit Agreement §9.1; Interim Order ¶8.b.

27.    Absent immediate access to the DIP Facility as request in the DIP Financing Motion, the Debtors will have insufficient cash to operate their business in the ordinary course. This would lead to the wholesale diminution of the value of the Debtors' assets

and business and would jeopardize the Debtors' efforts to reorganize through these chapter 11 cases.

**B.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 345(a) and 363(c)(1), FED. R. BANKR. P. 6003 AND 6004 AND LOCAL RULE 2015(2) (I) APPROVING CONTINUED USE OF CASH MANAGEMENT SYSTEM, (II) AUTHORIZING USE OF PREPETITION BANK ACCOUNTS AND EXISTING CHECKS, AND (III) GRANTING AN INTERIM WAIVER OF THE REQUIREMENTS UNDER 11 U.S.C. § 345(b) (the "Cash Management Motion")**

28.    Prior to the commencement of the Chapter 11 Cases, as part of their ordinary business practices, the Debtors maintained a cash management system, bank accounts, business forms and checks, and engaged in customary investment practices that are consistent with those followed by similar business enterprises.

29.    To avoid disruption to the ordinary and usual cash management and day-to-day operations, and to ensure an orderly transition into chapter 11, the Debtors, through the Cash Management Motion, request an order authorizing them to continue to use their existing cash management system, bank accounts, checks and business forms.  Specifically, the Cash Management requests an order, pursuant to sections 105(a), 345(b), 363(c) and 1107 of the Bankruptcy Code:

(a)    authorizing the Debtors, on the terms set forth in the Cash Management Motion and solely to the extent permitted under the terms of the Debtors' proposed debtor in possession financing, to continue to use their existing cash management system (the "**Cash Management System**") without interruption in the ordinary course of business;

(b)    directing that the Cash Management Banks (defined below) at which the Debtors maintain the Bank Accounts (defined below) are stayed from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the Bank Accounts which are utilized in the Debtors' day-to-day operations on or subsequent to the commencement of the Chapter 11 Cases for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Cash Management Banks;

(c)    directing the Cash Management Banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtors, any

funds in the Bank Accounts to the extent set forth in the Cash Management Motion;

(d)     authorizing the Debtors to maintain and continue to use, with the same account numbers, the Bank Accounts maintained with the Cash Management Banks, and directing that all such Bank Accounts be treated for all purposes as debtor in possession accounts;

(e)     authorizing and directing the Cash Management Banks to service and administer the Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtors for which payment is authorized by court order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Chapter 11 Cases, to cover such checks upon presentment;

(f)     authorizing the Debtors to use, in their present form, existing checks and other documents, including their existing business forms, relating to the Bank Accounts, _provided_, _however_, that the Debtors shall make reasonable best efforts to add a "DIP" designation to their existing checks and other business forms; and

(g)     granting a waiver of the investment guidelines of section 345 of the Bankruptcy Code, subject to a 60-day objection period for the United States Trustee (the "**U.S. Trustee**").

### Description Of The Debtors' Cash Management System

30.     The Debtors maintain certain concentration, deposit, payroll, disbursement and Imprest accounts (collectively, the "**Bank Accounts**") with  Wells Fargo Bank, N.A. ("**Wells Fargo**"), Bank of America, N.A., BBVA Compass Bank, First National Bank of Fort Smith, International Bank of Commerce, Nevada Bank and Trust, The Pecos County State Bank, Regions Bank, Fifth Third Bank, Royal Bank of Canada, PNC Bank and First Bank of Ohio (collectively, the "**Cash Management Banks**").  A list of the Bank Accounts is attached to the Cash Management Motion as **Exhibit A**.  The Debtors submit that all of the Bank Accounts are maintained with financially stable banking institutions.

31.     The Debtors maintain a concentration account (the "**Concentration Account**") at Wells Fargo, as well as numerous zero-balance deposit accounts (the "**Deposit**

**Accounts**") at Wells Fargo and various of the other Cash Management Banks. Throughout the day, the Debtors' various branch locations make deposits into the Deposit Accounts which are swept at the end of each business day into the Concentration Account. The Concentration Account is then used to fund the Debtors' disbursement account (the "**Disbursement Account**"), merchant account (the "**Merchant Account**") and two payroll accounts (the "**Payroll Accounts**"), all of which are held at Wells Fargo. The Disbursement Account is used to pay the Debtors' vendors and other creditors. The Merchant Account is maintained by the Debtors pursuant to the Merchant Agreement between the Debtors and Wells Fargo and is used to pay fees under the Merchant Agreement. The Debtors maintain two separate Payroll Accounts - one for issuing physical paychecks and one for funding payroll through Ceridian, the Debtors' payroll service provider. The Payroll Accounts are funded one day prior to each payroll date. In addition, the Debtors maintain numerous Imprest accounts (the "**Imprest Accounts**") at Wells Fargo and various other the other Cash Management Banks. The Imprest Accounts are used by each of the Debtors' various branch locations for purchases that would otherwise be made with petty cash and are funded either daily or weekly from the Concentration Account, depending upon the cash needs for a particular branch location.

32.     In addition, Debtor Lakefront Lines, Inc. ("**Lakefront**") maintains a concentration account (the "**Lakefront Concentration Account**") and four zero balance deposit accounts (the "**Lakefront Deposit Accounts**") at Fifth Third Bank. Throughout the day, Lakefront's various branch locations make deposits into the Lakefront Deposit Accounts which are swept at the end of each business day into the Lakefront Concentration Account. In addition, Lakefront's Canadian branch location maintains a separate deposit account at Royal Bank of Canada which is manually swept into the Lakefront Concentration Account on a monthly basis. The Concentration Account is then used to fund Lakefront's disbursement account (the "**Lakefront Disbursement Account**"), payroll account (the "**Lakefront Payroll Account**") and Imprest account (the "**Lakefront Imprest Account**") all of which are held at Fifth Third Bank. The Lakefront Disbursement Account is used to pay Lakefront's vendors and other creditors.

The Lakefront Payroll Account is used to fund Lakefront's bi-weekly payroll through Ahola, Lakefront's payroll service provider. The Lakefront Imprest Account is used by each of Lakefront's branch locations for purchases that would otherwise be made with petty cash and is funded daily from the Lakefront Concentration Account.

33. The Cash Management System includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors maintain and will continue to maintain detailed and accurate accounting records reflecting all transfers of funds. The Debtors' Cash Management System is similar to those used by other corporate enterprises and provides significant benefits to the Debtors, including the ability to (a) accurately and immediately report receipts and expenditures, (b) control corporate funds centrally, (c) ensure the availability of funds when necessary, and (d) reduce administrative expenses by centralizing the movement of funds.

34. Approval of the Cash Management Motion is critical to the Debtors' ability to operate their business in the ordinary course during the pendency of the chapter 11 cases.

**C.  MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 507(a) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND BENEFITS, (II) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO CONTINUE EMPLOYEE BENEFITS PROGRAMS AND PAYMENT OF RELATED ADMINISTRATIVE OBLIGATIONS AND (III) DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR, AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL FUND TRANSFER REQUESTS (the "<u>Wage Motion</u>")**

35. The Debtors request entry of an order authorizing, but not but not requiring, the Debtors to: (i) pay, in their sole discretion, all payments required under or related to Wages, Payroll Taxes, Withholding Obligations, Union Dues, Reimbursement Obligations, Health and Welfare Plan Obligations, Vacation Obligations, Sick Leave Obligations, Pension

Obligations, Independent Contractor and Temporary Employee Obligations, Other Employee Programs and Prepetition Processing Costs (each as defined below and, collectively, the "**Prepetition Employee Obligations**")[4] and all costs incident to the foregoing, and to continue to honor their practices, programs and policies for their Employees (as defined below), as those practices, programs and policies were in effect as of the Petition Date and as such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business; and (ii) authorize and direct applicable banks and other financial institutions (collectively, the "**Disbursement Banks**") to receive, process, and pay any and all checks drawn on the Debtors' bank accounts (the "**Bank Accounts**"), and automatic payroll transfers to the extent that those checks or transfers relate to any of the foregoing.

### Summary Of The Debtors' Prepetition Employee Obligations

36.    The Debtors estimate that their Prepetition Employee Obligations total approximately $12.7 million, excluding those Prepetition Employee Obligations (e.g., Vacation Obligations, Pension Obligations, and Severance Program Obligations) that either (i) will be honored or paid over time in the ordinary course of the Debtors' business, and/or (ii) may not require cash payments.  The Debtors do not believe that payments to be made, if any, in connection with prepetition wages, salary, other compensation and benefit programs will exceed the sum of $11,725 per employee allowable as a priority claim under sections 507(a)(4) and (5) of the Bankruptcy Code.  The payments to be made in connection with such prepetition wages (the "**Wages**") will not exceed the priority claim amount under sections 507(a)(4) and (5) of the Bankruptcy Code.

---

[4]    The Debtors believe that the list of wages, benefits and other programs and obligations is a comprehensive list of employee compensation and benefits.  To the extent, however, any plan or program was inadvertently omitted the term "Prepetition Employee Obligations" includes such plan or program.

### (i)    Wages, Salaries And Other Compensation

37.    The Debtors employ approximately 6,000 employees.[5]  Numerous of the Debtors' Employees are members of various different collective bargaining units (the "**Union Employees**").  The Debtors pay their employees on a bi-weekly, semi-monthly or weekly basis as follows: (i) 4,030 employees are paid on a bi-weekly basis (the "**Bi-Weekly Employees**"), (ii) 948 employees are paid on a semi-monthly basis (the "**Semi-Monthly Employees**"), and (iii) 612 employees are paid on a weekly basis (the "**Weekly Employees**").  The average payroll for the Bi-Weekly Employees is approximately $4 million.  The average payroll for the Semi-Monthly Employees is approximately $1.4 million.  The average payroll for the Weekly Employees is approximately $400,000.  The Debtors employ the services of Ceridian to calculate and issue the employees' paychecks (including all withholdings) and direct deposits.  Payroll funds are wire-transferred to Ceridian in advance for each payroll period.  In addition, Debtor Lakefront Lines, Inc. ("**Lakefront**") pays its employees on a bi-weekly basis (the "**Lakefront Employees**" and together with the Union Employees, the Bi-Weekly Employees, the Semi-Monthly Employees and the Weekly Employees, the "**Employees**").  The average payroll for the Lakefront Employees is approximately $300,000.  Lakefront employs the services of Ahola to calculate and issue the employees' paychecks (including all withholdings) and direct deposits. Payroll funds are wire-transferred to Ahola in advance for each payroll period.

38.    The estimated accrued and unpaid wages of the Debtors' employees is approximately $6.6 million.  The estimated accrued and unpaid wages of Lakefront employees is approximately $330,000.

39.    In the ordinary course of their business, the Debtors may also utilize the services of certain independent contractors (the "**Independent Contractors**") and temporary employees (the "**Temporary Employees**") from time to time.  The Independent Contractors and

---

[5]    Of the approximately 6,000 employees, approximately 450 are employed by Debtor Lakefront Lines, Inc. ("**Lakefront**").  As described more fully in the Wage Motion, Lakefront maintains its own payroll and benefits programs.

the Temporary Employees are critical and essential for the operation of the Debtors' business. The Independent Contractors and Temporary Employees are paid either weekly, bi-weekly or monthly depending upon the terms of the any agreement between the Debtors and such Independent Contractor or Temporary Employee.  By the Wage Motion, the Debtors also seek entry of an order authorizing, but not directing, them to pay all outstanding accrued compensation owed to the Independent Contractors and Temporary Employees as of the Petition Date up to the $11,725 limit established pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code, in the aggregate approximate amount of up to $150,000 (the "**Independent Contractor and Temporary Employee Obligations**").

40.     In the ordinary course of their business, some of the Debtors pay certain of the Employees commissions ("**Commissions**" and together with the Wages, Independent Contractor and Temporary Employee Obligations, the "**Compensation Obligations**"). Commissions are paid as part of the Debtors' payroll and amount to approximately $150,000 per quarter, paid on a monthly basis.  The Debtors believe that, as of the Petition Date, Commissions for December 2011 in the amount of approximately $35,000 are outstanding.  The Debtors seek entry of an order authorizing, but not directing, them to honor all liabilities to their employees in the ordinary course of business with respect to Commissions that accrued prior to the Petition Date and to continue their prepetition policies with respect to same going forward.

**(ii)     Withholding Obligations**

41.     The Debtors are required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, and social security and Medicare taxes (collectively, the "**Trust Fund Taxes**") and remit the same to the appropriate tax authorities (collectively, the "**Taxing Authorities**").  The Debtors are required to match from their own funds the social security and Medicare taxes, and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Trust Fund Taxes, the "**Payroll Taxes**") and to remit the Payroll Taxes to the Taxing Authorities.  The

Debtors estimate that, as of the Petition Date, approximately $750,000 in Payroll Taxes is due and payable to Taxing Authorities for employee withholdings and the employer share of such taxes.  Periodically, the Debtors withhold from the Wages certain amounts for charitable deductions, credit union obligations, loan payments and garnishment, and child support or other similar orders (the "**Withholding Obligations**").  The Debtors estimate that, as of the Petition Date, approximately $300,000 in Withholding Obligations has been withheld from Employee Wages and not yet remitted to the applicable third party.

### (iii)    Union Dues

42.    In the ordinary course of business, the Debtors withhold from the paychecks of certain domestic Employees amounts for the payment of dues to unions of which those Employees are members (the "**Union Dues**").  These withheld amounts are remitted to the respective unions.  The Union Dues are paid as part of the Debtors' payroll and amount to approximately $20,000 per month.  The Debtors believe that, as of the Petition Date, approximately $10,000 is outstanding with respect to prepetition Union Dues.

### (iv)    Business Expense Reimbursement

43.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  These reimbursement obligations include travel, lodging, ground transportation, meals, client entertainment expenses, professional seminars, professional licenses and other miscellaneous business expenses (the "**Reimbursement Obligations**").  The estimated Employee Reimbursement Obligations for 2011 are approximately $10 million. It is difficult for the Debtors to determine the exact amount of Reimbursement Obligations outstanding at any particular time.  However, based on historical trends, the Debtors estimate that, as of the Petition Date, the estimated outstanding Employee Reimbursement Obligations will be approximately $800,000.

### (v)   Health And Welfare Benefits

44.     The Debtors offer several health and welfare benefit plans for their Employees, including, but not limited to, coverage for medical, dental, hospitalization, vision, life insurance and disability insurance, while Lakefront offers benefit plans for the Lakefront Employees, including, but not limited to medical, dental, life insurance and disability insurance (collectively, the "**Health and Welfare Plans**" and the obligations thereunder or related thereto, the "**Health and Welfare Plan Obligations**").  The Debtors and Lakefront provide their eligible Employees with the Health and Welfare Plans at a reduced cost.  The Debtors' current total annual cost for providing the Health and Welfare Plans is approximately $10.2 million, while Lakefront's current total annual cost for providing the Health and Welfare Plans is approximately $600,000.  The Debtors and Lakefront estimate that, as of the Petition Date, the outstanding Health and Welfare Plan Obligations are approximately $100,000.

### (vi)   Vacation Policy And Sick Time

45.     The Debtors maintain policies under which Employees are provided with certain specific vacation, paid-time-off, personal days and holidays.  Eligible Employees accrue vacation time, paid-time-off and personal days depending on the number of hours worked and length of service.  Pursuant to the Debtors' vacation policy and collective bargaining agreements, eligible Employees are paid their full wage for each vacation day, up to the maximum number of days accrued by that Employee under the vacation policy.   Likewise, Lakefront maintains policies under which the Lakefront Employees are provided with certain vacation and holidays. Lakefront Employees are entitled to one to three weeks of vacation per year depending on length of service.  Pursuant to Lakefront's vacation policy, eligible Employees are paid their full wage for each vacation day, up to the maximum number of days accrued by that Employee under the vacation policy.  As of December 31, 2011, the Debtors had approximately $3 million in prepetition accrued obligations on account of vacation, paid-time off and personal days (collectively, the "**Vacation Obligations**").  The Vacation Obligations continue to accrue for use in the ordinary course of business.

46.     The Debtors also provide sick leave ("**Sick Leave**") to their Employees. Generally, eligible Employees are entitled to Sick Leave at variable rates of hours in accordance with applicable company policy or collective bargaining agreements.  Lakefront does not provide sick leave to the Lakefront Employees.

**(vii)    Retirement And Pension Plans**

47.     The Debtors maintain a qualified defined contribution plan for their Employees that meets the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "**Master 401(k) Plan**").   Under the terms of the Master 401(k) Plan, eligible Employees can contribute up to 100% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code. Additionally, participating Employees are eligible to receive an employer matching contribution on their pre-tax contributions of .50 cents for every $1 deferred up to 4% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the Master 401(k) Plan to be approximately $500,000.  The Debtors estimate that approximately $30,000 is due and owing from the Debtors as matching contributions to the Master 401(k) Plan.  Lakefront does not maintain a defined contribution plan for the Lakefront Employees.

48.     The Debtors also maintain several defined contribution plans for certain of the Union Employees that meets the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "**Union 401(k) Plans**" and together with the Master 401(k) Plan, the "**401(k) Plans**").  The Union 401(k) Plans are as follows:

(a)     "**Franciscan Local 665 Plan**" for members of Teamsters Automotive Workers Local Union 665: Under the Franciscan Local 665 Plan, eligible Employees can contribute up to 60% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code.  Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 50% of the first 10% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the Franciscan Local 665 Plan to be approximately $100,000.  The Debtors estimate that, as of the Petition Date,

approximately $5,000 is due and owing from the Debtors as matching contributions to the Franciscan Local 665 Plan.

(b)     "**Gulf Coast Transportation Union Plan**" for members of Teamsters, General Drivers, Warehousemen, Helpers, and Service Employees Local Union 968: Under the Gulf Coast Transportation Union Plan, eligible Employees can contribute up to 15% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code.     Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 50% of the first 4% of the Employee's deferral.     The Debtors estimate their annual matching contribution to the Gulf Coast Transportation Union Plan to be approximately $20,000.  The Debtors estimate that, as of the Petition Date, approximately $1,000 is due and owing from the Debtors as matching contributions to the Gulf Coast Transportation Union Plan.

(c)     "**Kerville Union Plan**" for members of Teamsters, General Drivers, Warehousemen, Helpers, and Service Employees Local Union 968 or Local Union 1110: Under the Kerville Union Plan, eligible Employees can contribute up to 25% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code.  Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 100% of the first 2% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the Kerville Union Plan to be approximately $40,000.  The Debtors estimate that, as of the Petition Date, approximately $2,000 is due and owing from the Debtors as matching contributions to the Kerville Union Plan.

(d)     "**K-T Contract Service Union Plan**" for members of The International Brotherhood of Teamsters Local 631: Under the K-T Contract Service Union Plan, eligible Employees can contribute up to 15% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code. Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 100% of the first 1% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the K-T Contract Service Union Plan to be less than $5,000.  The Debtors estimate that, as of the Petition Date, less than $1,000 is due and owing from the Debtors as matching contributions to the K-T Contract Service Union Plan.

(e)     "**Transit Services Union Plan**" for members of USWA Local 965: Under the Transit Services Union Plan, eligible Employees can contribute up to 30% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue

Code.  Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 50% of the first 4% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the Transit Services Union Plan to be less than $5,000.  The Debtors estimate that, as of the Petition Date, less than $1,000 is due and owing from the Debtors as matching contributions to the Transit Services Union Plan.

(f)     "**Elko Union Plan**"  The Debtors no longer have a union at this location therefore the 401K Plan is a "frozen" plan and the Debtors do not currently have any obligations on account of matching contributions to the Elko Union Plan.

(g)     "**El Expreso Union Plan**" for members of Teamsters, General Drivers, Warehousemen and Helpers Local Union 1110: Under the El Expreso Union Plan, eligible Employees can contribute up to 30% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code.  There is no matching provision under the El Expreso Union Plan.

(h)     "**Franciscan Local 856 Plan**" for members of Freight Checkers, Clerical Employees and Helpers Union Local No. 856: Under the Franciscan Local 856 Plan, eligible Employees can contribute up to 60% of their earnings, through payroll deductions, on a pre-tax basis, up to the limits imposed on those contributions under the Internal Revenue Code.  Additionally, participating Employees are eligible to receive an employer matching contribution on their before-tax contributions of 50% of the first 10% of the Employee's deferral.  The Debtors estimate their annual matching contribution to the Franciscan Local 856 Plan to be less than $1,000.  The Debtors do not currently have any obligations on account of matching contributions to the Franciscan Local 856 Plan.

49.     In addition, the Debtors have historically made contributions to the Union Employees' pension funds maintained by The International Brotherhood of Teamsters Local 631 and International Association of Machinists & Aerospace Workers, AFL-CIO, Peninsula Auto Machinists Local No. 1414 ( the "**Pension Obligations**").  The Debtors estimate the monthly Pension Obligations average less than $15,000.  As of the Petition Date, the Debtors estimate Pension Obligations totaling less than $15,000 are unpaid.

**(viii)   Deferred Compensation Plan**

50.     The Debtors maintain a Deferred Compensation Plan (the "**DCP**").  Under the DCP eligible Employees can elect to contribute up to 75% of their pre-tax base pay, deferred

until a distribution date selected by the Employee.  Additionally, participating Employees are eligible to receive an employer matching contribution on their pre-tax contributions to the DCP of .50 cents for every $1 deferred up to 4% of base pay.  When an Employee enrolls in the DCP, he or she can elect distribution in a lump sum or in annual installments up to a maximum period of five years, with distributions to occur before, at or after the Employee's separation from employment with the Debtors.  The Employees who participate are fully vested in the deferred compensation at all times, and become vested in the Debtors' contributions and earnings over time, based on years of service.

51.     Currently, there are 10 Employees participating in the DCP.  The total amount of deferred compensation held by the Debtors as of December 31, 2011 is approximately $120,000.  The Debtors are not currently required to make any payments on account of the DCP. The Debtors are seeking the authority to continue offering the DCP to their Employees in the ordinary course of business.

**(ix)     Other Employee Programs**

52.     In addition to the foregoing, the Debtors have various other practices, programs, and policies for their Employees, including, but not limited to, a number of incentive plans designed to provide compensation and other benefits to Employees in order to encourage exceptional Employee performance for the benefit of the Debtors' businesses and Employee training and compliance programs (collectively, the "**Other Employee Programs**").  Eligibility for the Other Employee Programs depends on the Employee's classification or level, and the amount of the incentive compensation depends on whether the Debtors and the eligible Employee meet certain performance objectives.  Subject to the requirements of section 503 of the Bankruptcy Code, the Debtors intend to continue and to honor such practices, programs, and policies after the Petition Date, as such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' operations.

As of the Petition Date, the Debtors estimate that approximately $550,000 is outstanding on account of the Other Employee Programs.

**(x)    Costs And Expenses Incident To The Foregoing**

53.    The Debtors incur costs incident to the Compensation Obligations and Withholding Obligations including processing costs and the employer portion of payroll-related taxes, as well as accrued but unpaid prepetition charges for administration of the Health and Welfare Plans, 401(k) Plans and Pension Plans (collectively, the "**Prepetition Processing Costs**"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid, as of the Petition Date, was approximately $75,000. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services provided by third-party providers with respect to the various employee benefit programs. By paying the Prepetition Processing Costs, the Debtors may avoid even temporary disruptions of such services and thereby ensure that their employees obtain all compensation and benefits without interruption. The Debtors seek authorization to pay all Prepetition Processing Costs.

54.    Approval of the Wages Motion is crucial for the Debtors' workforce and, therefore, for the Debtors' ability to operate their business in the ordinary course. Moreover, the failure to obtain the relief requested in the Wages Motion would have a significant and negative impact on the Debtors' employees.

**D.    MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 366 (I) PROHIBITING UTILITY PROVIDERS FROM DISCONTINUING, ALTERING OR REFUSING SERVICE ON ACCOUNT OF PREPETITION INVOICES, (II) DEEMING UTILITY PROVIDERS TO HAVE ADEQUATE ASSURANCE OF FUTURE PAYMENT, AND (III) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS FOR ADDITIONAL ASSURANCE (the "Utilities Motion")**

55.    Through the Utilities Motion, the Debtors seek entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**"), pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting the Utility Providers from discontinuing, altering or

refusing service on account of prepetition invoices, (ii) deeming the Utility Providers to have adequate assurance of future payment, and (iii) establishing procedures for resolving requests for additional assurance.

56.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, and seriously jeopardize the Debtors' reorganization efforts.  It is therefore critical that utility services continue uninterrupted during the Chapter 11 Cases.

57.     In the ordinary course of their business, the Debtors incur liabilities to the Utility Providers for, *inter alia*, electricity, gas, water, sewer service, telecommunications and internet services, cable television services and other services, at an average monthly total rate of approximately $400,000.  A list of the Utility Providers is attached to the Utilities Motion as **Exhibit C**.[6]

58.     The Debtors intend to pay all post-petition utility services as they become due.  Nevertheless, to provide additional assurance of payment for future services to the Utility Providers the Debtors will deposit $200,000 (the "**Adequate Assurance Deposit**") into a newly created, segregated, interest-bearing account (the "**Adequate Assurance Deposit Account**"), within ten (10) business days of the entry of the Final Order.  This Adequate Assurance Deposit represents an amount equal to the estimated aggregate cost for two weeks of utility service with respect to those Utility Providers paid directly by the Debtors, calculated as a historical average over the past twelve months; however, the Adequate Assurance Deposit does not include a

---

[6]     While the Debtors believe that all of their Utility Providers are listed in **Exhibit C** to the Utilities Motion, it is possible that certain Utility Providers may have been inadvertently omitted. Accordingly, the Debtors reserve the right to amend **Exhibit C** to add any omitted Utility Provider and to request that the relief set forth in the Utilities Motion apply to such entities.  In addition, the Debtors reserve the right to assert that any of the entities now or hereafter listed in **Exhibit C** are not "utilities" within the meaning of section 366 of the Bankruptcy Code.

deposit for any Utility Provider that is paid in advance for its services or holds a deposit equal to or greater than the estimated aggregate cost for two weeks of utility service with respect to such Utility Provider (which existing deposit shall be deemed to be adequate assurance with respect to such Utility Provider).   The Debtors submit that the proposed adequate assurance provides protection in excess of that required to grant sufficient adequate assurance to the Utility Providers.

59.     Given the nature of the Debtors' business, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' chapter 11 efforts.   Should one or more of the Utility Providers refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted.   Such an interruption would critically damage customer relationships, revenues, and profits, and would adversely affect the Debtors' chapter 11 efforts, to the detriment of their estates, creditors, employees and customers.   It is therefore critical that utility services provided to the Debtors continue uninterrupted.

60.     Accordingly, the Debtors seek an order providing that a Utility Provider shall be deemed to have received adequate assurance of payment in accordance with section 366(c)(1)(A)(vi) of the Bankruptcy Code by virtue of the payment of the Adequate Assurance Deposit unless and until a future order of this Court is entered requiring further adequate assurance of payment.   The Debtors also seeks authorization to pay the Adequate Assurance Deposit and Additional Assurance Requests (defined below) notwithstanding any other order of this Court to the contrary.

61.     To ensure that all Utility Providers receive adequate notice of the proposed Adequate Assurance Deposit and an opportunity to request different treatment, the Debtors request that the Court approve and adopt the following Adequate Assurance Procedures (the "**Procedures**" or "**Adequate Assurance Procedures**"):

(a)     The Debtors will serve a copy of the Utilities Motion, together with the proposed form of final order (the "<u>Final</u> <u>Order</u>"), on each Utility Provider within (3) business days after entry of the Interim Order.

(b)     If a Utility Provider is not satisfied with the proposed Adequate Assurance Deposit provided by the Debtors, the Utility Provider must serve a request for additional adequate assurance (the "**Additional Assurance Request**") such that it is received no later than 30 days after entry of the Interim Order (the "**Additional Assurance Deadline**") by (i) the Debtors, Coach America Holdings, Inc., 8150 North Central Expressway, Suite M1000, Dallas, Texas 75206, Attn: Brian Cejka, CRO at bcejka@alvarezandmarsal.com; and (ii) proposed counsel for the Debtors, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey, 07068, Attn: Sharon L. Levine, Esq. at slevine@lowenstein.com and S. Jason Teele, Esq. at steele@lowenstein.com and (iii) counsel to JPMorgan Chase Bank, N.A., as administrative agent for the Debtors' prepetition senior secured lenders and proposed post-petition secured lenders, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian E. Resnick, Esq. at brian.resnick@davispolk.com.

(c)     Any Additional Assurance Request must (i) be in writing; (ii) set forth the location(s) for which Utility Services is provided; (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits; (iv) identify why the Utility Provider believes the proposed Adequate Assurance Deposit is insufficient; (v) set forth what the Utility Provider would accept as satisfactory adequate assurance of payment; and (vi) provide an address, telephone number, and electronic mail address to which the Debtors may respond to the Additional Assurance Request.

(d)     Upon receipt of any Additional Assurance Request as set forth above, the Debtors shall have 30 days from the receipt of such Additional Assurance Request (the "<u>Resolution</u> <u>Period</u>") to negotiate with the Utility Provider to endeavor to resolve the Utility Provider's Additional Assurance Request. During this period, the Utility Provider may not discontinue, alter, or refuse service to, or discriminate against, the Debtors on the basis of any unpaid prepetition charges, the commencement of these Chapter 11 Cases, or any objections to the proposed Adequate Assurance Deposit.

(e)     Without further order of this Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider that served an Additional Assurance Request, if the Debtors, in their business judgment, determine that an Additional Assurance Request is reasonable.

(f)     If the Debtors determine an Additional Assurance Request is not reasonable and are unable to reach an alternative resolution with the Utility Provider before the end of the Resolution Period, the Debtors will

request a hearing before this Court to determine the adequacy of assurance of payment the Debtors have proposed with respect to the applicable Utility Provider (the "<u>Determination</u> <u>Hearing</u>") pursuant to section 366(c)(3) of the Bankruptcy Code.

(g)     Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be prohibited from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of unpaid prepetition charges, the commencement of these Chapter 11 Cases, or on account of any objections to the proposed Adequate Assurance.

(h)     The Proposed Adequate Assurance Deposit shall be deemed adequate assurance of payment for any Utility Provider that fails to serve a timely additional Assurance Request.

**E.     MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 507(a)(8) (I) AUTHORIZING THE DEBTORS TO PAY THE PREPETITION CLAIMS OF CERTAIN TAXING AND REGULATORY AUTHORITIES, (II) AUTHORIZING BANKS AND FINANCIAL INSTITUTIONS TO HONOR AND PROCESS ALL CHECKS AND WIRE TRANSFERS RELATED THERETO, AND (III) GRANTING RELATED RELIEF (the "<u>Taxes</u> <u>Motion</u>")**

62.     In the ordinary course of their business, the Debtors incur and/or collect taxes, including, but not limited to, income, franchise, sales, property, excise, fuel and other miscellaneous taxes in the operation of their businesses (collectively, the "**<u>Taxes</u>**") and remit such Taxes to various taxing and other regulatory authorities (collectively, the "**<u>Authorities</u>**") as they become due.  In addition, due to the nature of their business, the Debtors incur fees and other similar assessments (collectively, the "**<u>Other</u> <u>Charges</u>**"), including, but not limited to, vehicle registrations and fees, toll charges, vehicle permits and other miscellaneous charges and remit such Other Charges to various Authorities as they become due.

63.     Although the Debtors are current on substantially all of the Taxes and Other Charges that have become due as of the Petition Date, because certain of the Taxes and Other Charges are paid on a periodic basis (and in arrears), there is, in many instances, a delay between the time when the Debtors incur an obligation to pay the Taxes and Other Charges and the date such Taxes and Other Charges become due and payable.  Various Authorities may

therefore have claims against the Debtors for Taxes and Other Charges that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes and Other Charges that will come due during the pendency of the Chapter 11 Cases.

64.     Through the Taxes Motion, the Debtors seek authority, in their discretion, to pay the relevant Authorities any Taxes and Other Charges that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date and any pre-petition Taxes and Other Charges that arose prior to the Petition Date that become due and owing during the pendency of these cases in the ordinary course of business.   The Debtors estimate that outstanding pre-petition liabilities owing to the various Authorities for Taxes and Other Charges are approximately $2.9 million exclusive of any Taxes and Other Charges that may have been paid prior to the Petition Date, but have not cleared as of the Petition Date.

65.     To implement the relief requested in the Taxes Motion, the Debtors further request that the order approving the Taxes Motion authorize and direct banks and other financial institutions to honor and process transfers, deposits, or checks issued by any of the Debtors on account of any pre-petition Taxes and Other Charges that have not cleared as of the Petition Date.   The banks and other financial institutions may rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with the Taxes Motion without any duty of further inquiry and without liability for following the Debtors' instructions, provided that sufficient funds are available in the applicable amounts to make the payments.

**F.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(2) AND 503(b) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) CONTINUE PREPETITION INSURANCE COVERAGE AND PAY ALL RELATED PREMIUMS AND OBLIGATIONS THEREUNDER AND (B) MAINTAIN PREPETITION PREMIUM FINANCING AGREEMENTS AND PAY ALL OBLIGATIONS THEREUNDER, (II) MODIFYING THE AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS, AND (III) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS (the "<u>Insurance</u> <u>Motion</u>")**

66.    In order to prevent any disruption of the Debtors' insurance coverage and any attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek, through the Insurance Motion, authorization, but not the direction, to make any premium payments as necessary and to perform any other prepetition obligations that may be necessary to maintain their insurance coverage.

<u>Summary Of The Debtors' Insurance Policies And Programs</u>

67.    In connection with the ordinary course operation of their business, the Debtors maintain workers' compensation policies and various liability, property, and other insurance policies (collectively, the "<u>Insurance</u> <u>Policies</u>") through several different insurance carriers (the "<u>Insurance</u> <u>Carriers</u>") including, but not limited to, those Insurance Policies and Insurance Carriers listed on <u>Exhibit A</u> to the Insurance Motion.  As set forth in the Insurance Motion, the Insurance Policies include coverage for, among other things, liabilities and losses related to workers' compensation, commercial crimes, breach of officers' and directors' duties, personal injury, operation of vehicles, and various other property-related and general liabilities.

(i)    **Workers' Compensation Policies**

68.    Under the laws of the various jurisdictions in which the Debtors operate, the Debtors are required to maintain workers' compensation policies the "<u>Workers'</u> <u>Compensation</u> <u>Policies</u>") to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "<u>Workers'</u> <u>Compensation</u> <u>Claims</u>").  The annual premiums for the Workers' Compensation Policies total

approximately $857,000.  The premium for the Workers' Compensation Policies are paid pursuant to an insurance premium finance agreement discussed in more detail below.

69.     The Debtors have a per-event deductible (the "**Workers' Compensation Deductible**") of $1 million for each claim asserted under the Workers' Compensation Policies. The Debtors must pay the Workers' Compensation Deductible in full before the before the applicable Insurance Carrier's payment obligation arises.  Between January 1, 2011 and the Petition Date, the Debtors have paid approximately $4.1 million in Workers' Compensation Deductibles.

70.     As of the Petition Date, there were approximately 215 open Workers' Compensation Claims, which the Debtors estimate aggregate to a total liability of approximately $3.5 million.

      **(ii)**     **Liability And Property Insurance Policies**

71.     The Debtors also maintain various liability and property insurance policies (the "**Liability and Property Insurance Policies**"). These policies are essential to the ongoing operation of the Debtors' business.  The annual premiums for the Liability and Property Insurance Policies is approximately $6.6 million.  As of the Petition Date, the Debtors owed approximately $211,000 to various of the Insurers on account of the annual premiums for the Liability and Property Insurance Policies, not including any amounts due under the insurance premium finance agreement discussed in more detail below.

72.     The Debtors have a per-event deductible (the "**Liability and Property Deductible**") of $5 million for each claim asserted under the Liability and Property Insurance Policies. The Debtors must pay the Liability and Property Deductible in full before the applicable Insurance Carrier's payment obligation arises.

73.     The Debtors employ Marsh USA, Inc. (the "**Broker**") to assist them with the procurement and negotiation of their Insurance Policies. The Broker provides services to and

receives compensation (the "**Broker's Fees**") from the Debtors. As of the Petition Date, the Debtors' do not believe that they have any outstanding obligations on account of Broker's Fees.

### (iii)   Insurance Claims Administrators

74.     Sedgwick Claims Management Services, Inc. ("**Sedgwick**") processes claims under the Workers' Compensation Policies and Liability and Property Insurance Policies. The Debtors pay Sedgwick a fee for its services (the "**Sedgwick Fee**") on a quarterly basis, in advance. The Debtors estimate that the Sedgwick Fee will total approximately $900,000 in 2012 (an average of approximately $225,000 per quarter). Prior to the Petition Date, the Debtors paid the Sedgwick Fee for the period covering December 16, 2011 – March 15, 2012.

75.     Broadspire Services, Inc. ("**Broadspire**" and together with Sedgwick, the "**Insurance Claims Administrators**") also processes claims under the Workers' Compensation Policies and Liability and Property Insurance Policies. The Debtors pay Broadspire a fee for its services (the "**Broadspire Fee**" and together with the Sedgwick Fee, the "**Insurance Claims Administrators' Fees**"). The Broadspire Fee is invoiced and paid based on the volume of claims processed by Broadspire.

### (iv)   Insurance Premium Financing Agreement

76.     In addition, the Debtors entered into a premium finance agreement (the "**Premium Finance Arrangement**") with AFCO Premium Credit LLC (the "**Premium Lender**" and together with the Insurance Carriers, the Insurance Claims Administrators and the Broker, the "**Insurance Parties**") dated October 7, 2011, to finance the payment of premiums under certain insurance policies (the "**Financed Insurance Policies**") totaling $5,610,319.55. Under the Premium Finance Agreement, the Debtors made a down payment of $1,140,967.00 and are obligated to pay to the Premium Lender nine (9) monthly installments of $503,594.21 (the "**Payments**"). The annual interest rate under the Premium Financing Arrangement is 3.370%.

77.     The Debtors have made three (3) Payments with respect to the Premium Finance Agreement. The Debtors are required to make the next Payment of $503,594.21 on

January 16, 2012 with respect to the Premium Finance Agreement.  By the Insurance Motion, the Debtors seek authority to make this Payment and, for the avoidance of doubt, all remaining payments under the Premium Finance Agreement, which total $3,021,565.26.

78.     The Premium Finance Agreement includes a security provision which grants  the Premium Lender as security for the total amount payable under the Financed Insurance Policies any and all unearned premiums and dividends which may become due and payable under the Financed Insurance Policies and loss payments which reduce the unearned premiums.

**G.     MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363, 364, 1107, AND 1108 (I) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND (II) SCHEDULING A FINAL HEARING (the "Critical Vendor Motion")**

79.     Through the Critical Vendor Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105(a), 363, 364, 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing but not directing, the Debtors, in their discretion, (a) to pay the prepetition claims of vendors that provided goods and services essential to the operations of the Debtors' business (the "**Critical Vendors**") in an aggregate amount not to exceed $550,000 on an interim basis and in an aggregate amount not to exceed $1.35 million on a final basis (the "**Critical Vendor Cap**")[7] subject to availability and pursuant to any order of this Court governing the Debtors' use of their bank accounts or in respect of financing and (ii) scheduling a final hearing.

80.     The Debtors believe that payment of the prepetition claims of Critical Vendors (the "**Critical Vendor Claims**") is vital to the Debtors' restructuring efforts because without the Critical Vendors, the Debtors' ability to operate their businesses may be negatively impacted.  Moreover, the failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide goods and services essential

---

[7]     The Critical Vendor Cap is exclusive of approximately $1.25 million of estimated section 503(b)(9) claims of the Critical Vendors.

to the Debtors' post-petition businesses.  In order to maximize the value of the estates for the Debtors' creditors and other stake holders, the Debtors must continue to operate their businesses with as few interruptions as possible.  The Debtors submit that this is highly unlikely to occur without payments to the Critical Vendors, who are otherwise likely to stop providing essential goods or services unless they are paid on their claims.

81.     The Debtors have thoroughly examined whether the payment of Critical Vendor Claims is necessary.  Specifically, the Debtors have reviewed their accounts payable records and have undertaken a process to identify those vendors who are critical to the Debtors' operations.  The Debtors consulted with appropriate members of their management team to identify those vendors that are essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, because, for example, it provides a proprietary product or service, or because of other circumstances; (b) whether certain product or service requirements, or other specifications, prevent the Debtors from obtaining a particular vendor's products or services from alternative sources within a reasonable timeframe; (c) if a vendor is not a "sole-source" provider, whether the Debtors may temporarily do without that vendor's services or have sufficient product in inventory to continue operations while a replacement vendor is found and put in place; (d) whether the vendor in question is the lowest cost provider of a specific product or service; (e) whether a vendor is likely to refuse to ship goods or provide services to the Debtors post-petition if its prepetition balances are not paid; and (f) whether non-payment could put the vendor in question out of business and unable to supply the Debtors.

82.     The Debtors have also developed certain procedures, for which they seek this Court's approval, that, when implemented, will ensure that Critical Vendors receiving payment of Critical Vendor Claims will continue to supply the goods and services that are essential to the Debtors' operations on a post-petition basis.

83.     Therefore, the Debtors propose to condition the payment of Critical Vendor Claims on the agreement of each individual Critical Vendor to continue supplying

services to the Debtors on terms that are at least as favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six months prior to the Petition Date (the "**Customary Trade Terms**"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor. Specifically, the Debtors reserve the right to negotiate terms that include, among other things, waiving all or a portion of the balance of any prepetition claims.

84.     The Debtors further propose to make appropriate efforts, in their discretion, to cause each Critical Vendor to enter into an agreement (the "**Critical Vendor Agreement**") that includes, without limitation, the following terms:

(i)     The amount of such Critical Vendor's estimated prepetition claim, after accounting for any setoffs, other credits and discounts thereto, which shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the Critical Vendor Agreement and the order approving the Critical Vendor Motion (the "**Critical Vendor Order**") and shall not be deemed a claim allowed by the Court, and the rights of all parties-in-interest to object to such claim shall be fully preserved until further order of the Court);

(j)     The amount and timing of any payment agreed to be paid by the Debtors in satisfaction of such estimated prepetition claim, subject to the terms and conditions as set forth in the Critical Vendor Order;

(k)     The Critical Vendor's agreement to provide goods and/or services to the Debtors based upon the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other terms and programs, as applicable), or such other favorable trade terms as mutually agreed to by the Debtors and such Critical Vendor, and the Debtors' agreement to pay the Critical Vendor in accordance with such terms;

(l)     The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their assets or properties (real or personal) any lien(s) (a "**Lien**") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods and services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has

previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to release such Lien;

(m)    The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Critical Vendor Order and consents to be bound thereby;

(n)    The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims;

(o)    If a Critical Vendor who has received payment of a prepetition claim subsequently refuses to supply goods and/or services to the Debtors on Customary Trade Terms or other favorable trade terms, or otherwise fails to comply with any trade agreement it entered into with the Debtors, the Debtors retain the right to, in their discretion and without further order of the Court, (i) declare that any trade agreement between the Debtors and such Critical Vendor is terminated (if applicable) and (ii) declare that any payments made to such Critical Vendor on account of its Critical Vendor Claim, whether pursuant to a trade agreement or otherwise, will be deemed to have been in payment of then-outstanding post-petition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the post-petition obligations then outstanding, without the right of setoff or reclamation; and

(p)    In exchange for a payment authorized under the Critical Vendor Order, the Critical Vendor shall waive and release all other claims against the Debtors including, without limitation, any claims arising under section 503(b)(9) of the Bankruptcy Code.

85.    Such Critical Vendor Agreements shall be substantially similar to the form attached to the Critical Vendor Motion as **Exhibit A** and may be in addition to any other agreements between the parties.

86.    The Debtors reserve the right to negotiate new trade agreements with any Critical Vendor as a condition of payment to any Critical Vendor Claim, including, without limitation, that any Critical Vendor be required to waive some or all of the balance of any unpaid claim, including, without limitation any claim pursuant to Bankruptcy Code section 503(b)(9).

87.    The Debtors further propose that all payments of Critical Vendor Claims shall be applied first to the Critical Vendor's administrative expense claim under section 503(b)(9) for goods received by the Debtors within the twenty (20) days prior to the Petition

Date, and the remainder, if any, shall be applied from the sums permitted under the Critical Vendor Cap to the Critical Vendor Claims for goods received by the Debtors prior to the twenty (20) days prior to the Petition Date.

**H.      MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(c) (I) AUTHORIZING THE DEBTORS TO PAY AND HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS, AND (II) AUTHORIZING AND DIRECTING THE DISBURSEMENT BANKS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS (the "<u>Customer Programs Motion</u>")**

88.      Through the Customer Programs Motion, the Debtors request the entry of interim and final orders pursuant to sections 105(a) and 363(c) of the Bankruptcy Code (i) authorizing the Debtors, in their business judgment, to (a) perform and honor their prepetition obligations related to the Customer Programs as they deem appropriate, and (b) continue, renew, replace, implement new, and/or terminate one or more of the Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court, and (ii) authorizing and directing the Disbursement Banks (as defined below) to honor and process related checks and transfers.

<strong><u>The Debtors' Customer Programs</u></strong>

89.      The Debtors' customers are the lifeblood of their business. In the Debtors' competitive business, customer satisfaction is the key to survival. Before the Petition Date and in the ordinary course of their business, the Debtors offered various customer programs and engaged in certain customer practices to develop and sustain a positive reputation in the marketplace for their services and to engender customer loyalty (collectively, the "**<u>Customer Programs</u>**" and the obligations thereunder and related thereto, collectively, the "**<u>Customer Program Obligations</u>**"). The Customer Programs include, but are not limited to, refunds, deposits, discounts and promotional programs.

90.     Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors request authority in their business judgment to (i) perform and honor the prepetition Customer Program Obligations as they deem appropriate, and (ii) continue, renew, replace, implement new, and/or terminate one or more of the Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

91.     Bus operators routinely serve the same routes and destinations as their competitors. This competition makes retaining loyal customers and attracting new customers critically important. Without winning and preserving the loyalty of their customers, the Debtors' business would suffer dramatically. It is essential, therefore, that the Debtors maintain their current customers through the pendency of the Chapter 11 Cases and position themselves to attract new customers. The Customer Programs are integral to this goal.

92.     Commencing the Chapter 11 Cases may negatively affect customers' attitudes and behavior toward the Debtors' services unless the Debtors can take the measures requested by the Customer Programs Motion. These measures will quickly serve to demonstrate that the Customer Programs will remain intact and that customers can rely on such programs on an ongoing basis.

93.     In particular, the Debtors' goodwill and ongoing business relationships may erode if their customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises they have made through the Customer Programs. The same would be true if customers perceived that the Debtors will no longer be offering the types of or quality of services they have come to expect, and upon which those customers rely when purchasing the Debtors' services. Further, the Debtors' competitors are likely to increase their efforts during the pendency of these Chapter 11 Cases to try to lure away the Debtors' customers. The maintenance of the Customer Programs is essential to thwart these efforts. The following are general descriptions and examples of some, but not all, of the Debtors' Customer Programs.

### (i)    Customer Refunds

94.    To remain competitive and to retain the goodwill and confidence of their customers, it is important that the Debtors continue to issue refunds for those tickets originally sold with a refundable option (collectively the "**Refundable Tickets**").    Maintaining the refundability of tickets purchased prepetition will enhance the public's confidence in the Debtors' continued reliability and operations. Accordingly, the Debtors request authority to issue cash refunds on tickets purchased before the Petition Date.  Moreover, if refunds on refundable tickets are denied, a large percentage of the individuals holding such Refundable Tickets will likely have priority claims under section 507(a)(7) of the Bankruptcy Code.

### (ii)    Customer Deposits

95.    The Debtors routinely accept deposits from customers for future travel. It is important that the Debtors continue to apply any and all deposits to future ticket purchases, to maintain goodwill and the loyalty of their customers. Absent the ability to process customer deposits in the ordinary course, the Debtors would be faced with additional claims and would lose ticket sales to a competitor.

### (iii)    Promotional Programs

96.    The Debtors use multiple sales tools, including, but not limited to, credits for travel, vouchers, passes to attractions and other program awards (collectively, the "**Promotional Programs**"). These authorizations are, from time to time, issued by the Debtors as part of promotional programs, as part of a tour package, or in lieu of cash payments. The Debtors' inability to honor the obligations incurred pursuant to the Promotional Programs may have a negative effect on the confidence in the Debtors' business and the Debtors' ability to fulfill obligations to passengers. This would likely translate into a diminution in ticket purchases and harm to the estates. The Debtors believe the cost of honoring the obligations relating to the Promotional Programs is more than offset by the reciprocal benefit the Debtors receive.

(iv)     **Fare Discounts**

97.     The Debtors offer discounts to passengers who travel a route on a routine basis (i.e., monthly) or who purchase tickets in volume.  These discounts are imperative for the Debtors to remain competitive and to continue attracting customers.

98.     The Debtors' Customer Programs ensure customer satisfaction, generate goodwill, and meet competitive pressures so that the Debtors can retain current customers, attract new customers, and ultimately enhance revenues.

I.    **MOTION OF THE DEBTORS FOR ENTRY OF ORDER (I) PURSUANT TO 11 U.S.C. §§ 105(a) AND 365(a) APPROVING ASSUMPTION OF INTERLINE AGREEMENTS AND CLEARINGHOUSE PARTICIPATION AGREEMENT AND (II) PURSUANT TO 11 U.S.C. § 362 MODIFYING THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO EFFECTUATE THE REQUESTED RELIEF (the "Interline Agreements Motion")**

99.     Through the Interline Agreements Motion, the Debtors request approval, pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, to assume the interline agreements set forth on **Exhibit A** to the Interline Agreements Motion (the "**Interline Agreements**") and the clearinghouse participation agreement (the "**Clearinghouse Participation Agreement**, and together with the Interline Agreements, the "**Agreements**") by and between the Debtors and the National Bus Traffic Association, Inc. (the "**NBTA**").

100.     Because certain of the Agreements provide for an ongoing mutual billing and settlement and adjustment process that necessarily entails continuing submission of billings to the Debtors and continuing setoffs of obligations owed to and obligations owed by the Debtors, the Debtors also request that the Court modify the automatic stay (the "**Automatic Stay**") extant under section 362(a) of the Bankruptcy Code to the extent necessary to enable the counterparties to participate in routine billings and settlements in accordance with certain of the Agreements.

(i)     **The Interline Agreements**

101.     The Interline Agreements are an integral part of the Debtors' business. Interline agreements allow bus carriers to accept each other's tickets for transportation over the

other carriers' systems.  These agreements enable the carriers and travel agents to issue a single ticket that can be used for travel on more than one carrier. Interline agreements also allow passengers whose routes are late or canceled to use their ticket with another carrier for a substitute route.  Under the Interline Agreements, each carrier is authorized to, among other things, issue tickets for transportation of passengers and baggage by the other party.

102.    The Debtors' continued ability to enforce and perform under the Interline Agreements is critical to the Debtors' ability to continue operating their business. The Debtors cannot afford the risk of any of the counterparties to the Interline Agreements questioning the Debtors' willingness or ability to continue participating in the Interline Agreements. Even the slightest interruption in the Debtors' ability to seamlessly integrate their ticketing, passenger, and other services with other carriers could be disastrous to their business and cripple the Debtors' opportunity to reorganize.

103.    Accordingly, the Debtors request approval under section 365(a) of the Bankruptcy Code to assume the Interline Agreements, to renew and continue the Interline Agreements, and to cure any defaults thereunder in the ordinary course of business.

**(ii)    The Clearinghouse Participation Agreement**

104.    The Debtors settle their mutual payment obligations arising under many of the Interline Agreements pursuant to the Clearinghouse Participation Agreement.  Under the Clearinghouse Participation Agreement, the Debtors settle their interline revenue debits and credits derived from operations conducted pursuant to the Interline Agreements through the clearinghouse operated by the NBTA (the "**NBTA Clearinghouse**").

105.    Pursuant to the NBTA Interline Reclaim Procedures Manual, which governs the Clearinghouse Participation Agreement, participating carriers are required to prepare interline reclaims (invoices and credit memos) and send them, with supporting detail, to the carrier being billed and the NBTA Clearinghouse, on or before the 25th day of each month.  On the last business day of each month, the NBTA Clearinghouse provides each carrier with a final

summary report for that given settlement month indicating the carrier's total debit, total credit and balance "due to" or "due from" the carrier for that settlement period.  On the first business day of each month, the NBTA Clearinghouse will automatically draft the bank accounts of those participating carriers who owe a net amount to the NBTA Clearinghouse which amounts are automatically transferred from the carrier's bank account into the NBTA Clearinghouse's bank account.  On the 10th of the month or, if this date falls on a weekend or holiday, the last business day before, unless otherwise advised, the NBTA Clearinghouse automatically deposits the net amount due from the NBTA Clearinghouse to each participating carrier's designated bank account.  Billings that have been settled through the NBTA Clearinghouse remain subject to audit and adjustments under rejection/chargeback, rebilling and dispute resolution procedures set forth in the NBTA Interline Reclaim Procedures Manual.

106.    The Debtors request approval under section 365(a) of the Bankruptcy Code to assume the Clearinghouse Participation Agreement and cure any defaults thereunder in the ordinary course of business, including permitting interline creditors to complete mutual pre- and post-petition offsets with respect to the Interline Agreements.   The Clearinghouse Participation Agreement is critical to the Debtors' business operations.  The Debtors' inability to preserve the Clearinghouse Participation Agreement would render it impossible for them to function under the Interline Agreements and provide necessary services to their customers.

**J.     MOTION OF THE DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION AMOUNTS OWED TO FUEL SUPPLIERS, (II) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO HONOR, PERFORM, AND EXERCISE THEIR RIGHTS AND OBLIGATIONS UNDER FUEL SUPPLY ARRANGEMENTS, AND (IV) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR RELATED CHECKS AND TRANSFERS (the "Fuel Supply Motion")**

107.    By the Fuel Supply Motion, the Debtors request that the Court authorize, but not direct, the Debtors to (i) pay any outstanding prepetition obligations to Fuel Suppliers (as defined below) and (ii) continue honoring, performing, and exercising their rights and

obligations (whether prepetition or post-petition) under Fuel Supply Arrangements (as defined below); provided, however, that the honoring, performing, or exercising of those rights and obligations shall not give rise to administrative expenses or assumption of any executory contract solely as a result of the entry of an order granting the Fuel Supply Motion.

108.    The Debtors also request that the Court authorize and direct the banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Debtors' obligations to Fuel Suppliers.  The Debtors also seek authority to issue new post-petition checks, or effect new electronic fund transfers, on account of their obligations to Fuel Suppliers to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Chapter 11 Cases.

109.    Fuel is the lifeblood of the Debtors' business. An uninterrupted fuel supply for the Debtors' fleet of buses is crucial to their continued operations and successful reorganization.  Many of the Debtors' Fuel Suppliers cannot be easily or quickly replaced. Absent the relief requested in the Fuel Supply Motion, the Debtors' fuel supply and distribution system could be disrupted, thereby damaging the Debtors' relationship with its customers and potentially the Debtors' credibility in the marketplace.  Even if the Debtors were able to procure alternate sources of fuel, the Debtors' costs for fuel would dramatically increase because of the piecemeal nature of an alternate supply, and there would be no assurance that the Debtors would be able to timely procure adequate fuel.

### The Debtors' Fuel Supply Arrangements

110.    Debtor KBUS Holdings, LLC ("**KBUS Holdings**") and Southern Counties Oil Co. dba SC Fuels ("**SC Fuels**") are parties to a fuel supply agreement dated July 6, 2010 (the "**SC Fuels Agreement**").  Pursuant to the SC Fuels Agreement, KBUS Holdings agrees to purchase 100% of its requirements for ultra low sulfur diesel fuel for the period from July 15,

2010 through July 14, 2012.  Pricing under the SC Fuels Agreement is based on the daily Oil Price Information Service ("**OPIS**") index, plus freight, applicable taxes and fees.  The rate is then adjusted by a differential, which varies by location.  The Debtors' fuel purchases under the SC Fuels Agreement are made on account and paid in arrears net fifteen (15) days from the date of delivery from SC Fuels.  Either party to the SC Fuels Agreement has the right to terminate the SC Fuels Agreement after the initial term has expired on thirty (30) days written notice. In addition, SC Fuels has the right to terminate the SC Fuels Agreement if (i) KBUS Holdings defaults in any of its obligations under the SC Fuels Agreement or (ii) in SC Fuels' sole discretion, the credit worthiness of KBUS Holdings materially declines.

111.    Debtor CUSA, LLC are Mansfield Oil Company of Gainesville, Inc. ("**Mansfield**") are parties to a fuel supply agreement dated July 15, 2009 (the "**Gainesville Agreement**" and together with the SC Fuels Agreement, the "**Fuel Supply Agreements**"). Pursuant to the Gainesville Agreement, CUSA, LLC agrees to purchase from Mansfield all of its petroleum products, for a period of three (3) years.  Pricing under the Mansfield Agreement is based on the daily OPIS index, plus freight, applicable taxes and environmental fees.  The rate is then adjusted by a differential, which varies by location.  Additionally, Mansfield is required to coordinate certain maintenance services on fuel related equipment for CUSA, LLC.  The Debtors' purchases under the Mansfield Agreement are made on account and full payment for the purchases made during each month is due by the tenth (10th) day of the following month. Either party to the Mansfield Agreement has the right to terminate the Mansfield Agreement for any reason on thirty (30) days written notice. In addition, in the event that CUSA, LLC fails to make any and all payments in a timely manner or to meet Mansfield's continuing credit approval, Mansfield is authorized to immediately suspend fuel deliveries and/or services until such time as CUSA, LLC pays all outstanding invoices and meets Mansfield's continuing credit approval.

112.    In addition, the Debtors purchase fuel from a variety of other suppliers (the "**Other Fuel Suppliers**" and together with SC Fuels and Mansfield, the "**Fuel Suppliers**")

pursuant to certain other arrangements, including, but not limited to, contracts (whether written or oral) and purchase orders (collectively, the "**Other Fuel Service Arrangements**" and together with the Fuel Supply Agreements, the "**Fuel Supply Arrangements**").  The services provided pursuant to the Other Fuel Service Arrangements are necessary to the Debtors' operations.  Most of the Debtors' fuel purchases under the Other Fuel Service Arrangements are made on account and paid in arrears net fifteen (15) days from the date of delivery.

113.    The Debtors estimate that their obligations under the Fuel Supply Arrangements, as of the Petition Date, total approximately $2.5 million.

**K.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 365(a) AND FED. R. BANKR. P. 6006 APPROVING ASSUMPTION OF CERTAIN EXECUTORY CREDIT CARD PROCESSING AGREEMENTS (the "Credit Card Processing Motion")**

114.    By the Credit Card Processing Motion, the Debtors request authority to assume certain credit card processing agreements, pursuant to section 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006.

### The Debtors' Credit Card Processing Agreements

115.    The Debtors derive a substantial portion of their revenue from credit card sales and other types of non-cash forms of payments.  As more fully described below, customers may purchase tickets and other services from the Debtors using a variety of credit cards and other types of non-cash forms of payment.  These purchases generally are made directly from the Debtors at ticket counters and city ticketing offices or by telephone, mail, or the Internet or through travel agents.  In 2011, after deducting fees, the Debtors received approximately $38.7 million from credit card and other types of non-cash forms of payment.

**(i)    The Wells Fargo Merchant Agreement**

116.    Wells Fargo Merchant Services, L.L.C. and Wells Fargo Bank, N.A. (collectively, "**Wells Fargo**") serve as the processor for the vast majority of all purchases made from the Debtors using credit cards and other types of non-cash forms of payment.  Debtor

CUSA, LLC and certain of its Debtor affiliates and subsidiaries entered into a merchant agreement with Wells Fargo (the "**Wells Fargo Merchant Agreement**") in or around July 2008. The initial three-year term of the Wells Fargo Merchant Agreement has already expired and pursuant to its terms, the Wells Fargo Merchant Agreement will renew for successive one year terms unless and until the Debtors provide written notice of at least ninety (90) days prior to the end of the then current term.  Pursuant to the terms of the Wells Fargo Merchant Agreement, Wells Fargo may terminate the Wells Fargo Merchant Agreement for any reason on twenty (20) days prior written notice.

117.    Pursuant to the Wells Fargo Merchant Agreement, the Debtors are authorized to accept the following forms of payment from their customers: (i) credit cards issued by VISA, MasterCard, Discover and American Express, (ii) non-PIN debit cards and (iii) JCB Card, PIN debit cards, Electronic Benefits Transfer payments, TeleCheck check services and cards from other non-bank card organizations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.  When honoring such credit cards and payment forms, the Debtors are required to follow certain contractual procedures as set forth in the Wells Fargo Merchant Agreement, including properly processing any transactions involving the credit card, verifying credit line availability, and reporting attempted fraud.  With the exception of certain liabilities relating to Chargebacks (as defined below), the Debtors are not exposed to the risk of nonpayment by customers who purchase tickets or pay for other goods or services using one of these payment methods.

118.    Pursuant to the Wells Fargo Merchant Agreement, for any transaction involving the payment methods covered by the Wells Fargo Merchant Agreement, the Debtors are required to produce a sales draft (the "**Sales Draft**"), which the Debtors forward to Wells Fargo in accordance with the terms and timetables set forth in the Wells Fargo Merchant Agreement, and requests payment from Wells Fargo, minus a fee.  Wells Fargo then seeks payment from the issuing credit card company, bank or non-bank card institution, which, in turn, seeks payment from the customer.  In certain instances, Wells Fargo will also deduct an

"interchange fee," which is forwarded to the respective credit card company, bank or non-bank card institution.

119.     When a customer who purchases goods or services from the Debtors using one of the payment methods covered by the Wells Fargo Merchant Agreement is properly owed a refund or is dissatisfied with the goods and services and refuses to pay, or in the case of fraud or unrecognized charges, the Debtors must return, or "chargeback," to the issuing credit card company, bank or non-bank card institution any funds received for these payments (the "**Chargebacks**"), as set forth in the Wells Fargo Merchant Agreement.

**(ii)     The Sterling Merchant Agreement**

120.     Debtor American Coach Lines of Miami, Inc. ("**ACLM**") and Sterling Buying Group ("**Sterling**") are parties to a merchant processing agreement (the "**Sterling Merchant Agreement**" and together with the Wells Fargo Merchant Agreement, the "**Credit Card Processing Agreements**") dated September 28, 2009.  The initial one-year term of the Sterling Merchant Agreement has already expired and pursuant to its terms, the Sterling Agreement has converted to a month-to-month agreement unless and until ACLM provides written notice of at least thirty (30) days prior to the end of the then current term.

121.     Pursuant to the Sterling Merchant Agreement, ACLM is authorized to accept from their customers credit cards issued by VISA, MasterCard and Discover.  When honoring such credit cards and payment, ACLM is required to follow certain contractual procedures as set forth in the Sterling Merchant Agreement, including properly processing any transactions involving the credit card, verifying credit line availability, and reporting attempted fraud.

122.     Pursuant to the Sterling Merchant Agreement, for any transaction involving the payment methods covered by the Sterling Merchant Agreement, ACLM is required to settle all transactions no later than the close of business on the first business day following completion of the transaction via an electronic transmission prepared by ACLM.  Sterling then

remits payment to ACLM, minus a fee.  Sterling then seeks payment from the issuing credit card company, bank or non-bank card institution, which, in turn, seeks payment from the customer. In certain instances, Sterling will also deduct an "interchange fee," which is forwarded to the respective credit card company, bank or non-bank card institution.

123.    When a customer who purchases goods or services from ACLM using one of the payment methods covered by the Sterling Merchant Agreement is properly owed a refund or is dissatisfied with the goods and services and refuses to pay, or in the case of fraud or unrecognized charges, ACLM must issue a Chargeback to the issuing credit card company.

**L.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 365(a), 363(b) AND 105(a) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION OBLIGATIONS OWED TO FOREIGN CREDITORS, (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) AUTHORIZING THE ASSUMPTION OF EXECUTORY CONTRACTS WITH FOREIGN COUNTERPARTIES (the "<u>Foreign Creditors Motion</u>")**

124.    By the Foreign Creditors Motion, the Debtors request entry of an order pursuant to sections 365(a), 363(b) and 105(a) of the Bankruptcy Code (i) authorizing, but not directing, the Debtors to pay prepetition obligations owed to foreign creditors, (ii) authorizing and directing financial institutions to honor and process related checks and transfers, and (iii) authorizing the assumption of executory contracts with foreign counterparties.  Because foreign parties may not be subject to the laws of the United States or orders of this Court, it is imperative that the Debtors immediately assumed the Agreements (defined below) and otherwise obtain the necessary authority to continue performing their obligations with respect to such foreign parties.

**(i)    International Services Agreement**

125.    In the ordinary course of business, Debtor CUSA EE, LLC dba El Expreso Bus Company ("**El Expreso**") entered into an International Service Agreement (the "**ISA**"), dated as of October 1, 2009, with Coordination of Autobuses Estrella Blanca, S.A. de C.V.

though its members, jointly and severally, Autobuses Americanos S.A. de C.V and Omnibus Americanos S.A. de C.V. (collectively, the "**Foreign Counterparties**").

126.    The ISA sets forth El Expreso's and the Foreign Counterparties' agreement to operate through-buses for the transportation of passengers and cargo from Houston, Texas to Monterrey, Mexico.  El Expreso operates the buses from Houston to the International Bridge between Laredo, Texas and Nuevo Laredo, Tamaulipas, Mexico.   The Foreign Counterparties operate the buses from  the Mexican border to Monterrey.  There, the parties turn over control and possession of each bus to the other party's representative, thereby transferring responsibility for operation of the bus along the route.  Service on each party's segment of the route is provided by drivers/operators employed and paid by such party.  Furthermore, each party is responsible for (i) loss, damage or destruction of buses, damage, and (ii) loss or damage to baggage, that occurs on their segment.  The contract also governs how liability will be allocated where the location of damage occurred cannot be determined.

127.    Revenues are apportioned according to percentage of the mileage of any given trip over the respective party's segment.  There are two points of revenue along the route: ticket sales and vehicle leases.  Ticket sales for transportation operated on both parties' route segments is divided on the basis of percentage of mileage operated by each company over the route.  When a party sells a ticket for transportation solely on its own segment, that party retains 100% of the sale.  When a party sells a ticket for transportation on the other party's segment, the seller is entitled a 10% sale commission.  The parties also agree to lease to each other the vehicles used on the route.  The rate expressed in the ISA is $0.15 cents per mile and $0.31 cents maintenance fee per mile.  Fuel costs are prorated in accordance to the number of miles of the party's traveled segment, with an accounting settlement performed each month.

128.    The ISA includes an *ipso facto* clause providing for the termination of the ISA in the event of bankruptcy, receivership, or dissolution of any of the parties.  The ISA also grants the non-debtor party a security interest in any amounts due and owing at the time of the filing of the bankruptcy, receivership or dissolution.  The ipso facto clause assumes a position of

importance in this context because the Foreign Counterparties may not be subject to the laws of the United States or orders of this Court, and may deem the ISA terminated (and assert a security interest in certain of the Debtors' property) as a result of the commencement of the Chapter 11 Cases.

129.   As of the Petition Date, the Debtors owe approximately $250,000 under the ISA that would give rise to a cure payment obligation under section 365 of the Bankruptcy Code.   Accordingly, by the Foreign Creditors Motion, the Debtors seek authority to pay any amounts due and owing under the ISA pursuant to section 365 of the Bankruptcy Code.

(ii)   **Prepaid Funding Agreement**

130.   In addition to the ISA, El Expreso and the Foreign Counterparties entered into a Prepaid Funding Agreement (the "**Funding Agreement**" and, together with the ISA, the "**Agreements**"), dated as of October 1, 2009.  Under the Funding Agreement, El Expreso pays the Foreign Counterparties an upfront fee for the refurbishment of the vehicles leased under the ISA.  These fees are credited to El Expreso and are used to reduce the payments that would otherwise be owed under the ISA.  The Funding Agreement provides any portion of the advance payment that has not been repaid from credits under the ISA after twelve months following the commencement of service under the ISAA, the remaining amount will be refunded within 30 days of that time.  Thus, the Debtors believe that all payment obligations under the Funding Agreement have now expired.  However, there continuing non-monetary obligations under the Funding Agreement, such as the obligation cooperate with Foreign Counterparties in their efforts to obtaining registration of vehicles.

131.   The Debtors believe there are no outstanding monetary obligations under the Funding Agreement that would give rise to a cure payment obligation under section 365 of the Bankruptcy Code. However, in an abundance of caution, through the Foreign Creditors Motion, the Debtors seek authority to pay any cure costs that the Debtors agree with the Foreign Counterparties are due and owing.

### (iii)    Other Foreign Creditors

132.    In connection with operating the through-bus service under the ISA, El Espresso utilizes the services of a Mexican vendor - El Expreso Transporte - to provide payroll and related services in Mexico.  As of the Petition Date, the Debtors owed El Expresso Transporte approximately $35,000 for services provided prior to the Petition Date.

133.    The benefits received by the Debtors under the Agreements, and their relationship with El Expreso Transporte, are important to their overall operations.  These benefits include, but are not limited to, increased revenue and the goodwill associated with providing services along the routes covered by the ISA, which are important to many of the Debtors' customers.

### (iv)    Terms Governing Payment

134.    In connection with the payment of the claims of any foreign creditor, the Debtors propose (unless otherwise waived by the Debtors in their discretion) that in exchange for payment of their prepetition claims, the foreign creditors continue to provide goods and services and to perform under the Agreements (defined below) to the Debtors on the most favorable terms in effect between the creditor and the Debtors in the twelve (12) month period preceding the Petition Date or on such other terms as the Debtors and the creditor may otherwise agree; provided, however, that the Debtors pay for the goods and services in accordance with the payment terms provided in the Agreements.

135.    The Debtors' ability to pay any claims of foreign creditors is subject in all respects to the terms of the proposed debtor in possession financing facility.

### M.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 364 AUTHORIZING THE DEBTORS TO CONTINUE CORPORATE CREDIT CARD PROGRAMS (the "Corporate Credit Card Programs Motion")

136.    In the ordinary course of business, the Debtors maintain certain corporate credit card programs (collectively, the "**Corporate Credit Card Programs**").  Pursuant to the Corporate Credit Card Programs, the Debtors issue cards to certain employees who use the cards

to make business critical purchases, including, but not limited to fuel purchases. The cards are critical to maintaining ongoing operations and not easily replaceable either on a timely basis or without substantial disruption to the ability of the Debtors to obtain items necessary for continued operations. Accordingly, by the Corporate Credit Card Programs Motion, the Debtors seek authority to continue the Corporate Credit Card Programs uninterrupted during the pendency of the Chapter 11 Cases.

### The Corporate Credit Card Programs

(i)      **WEX Corporate Credit Card Program**

137.    Debtor CUSA, LLC and Wright Express Financial Services Corporation ("**WEX**") are parties to a Corporate Card Program Application and Master Agreement dated as of January 6, 2006, as may have been amended from time to time (as amended, (the "**WEX Corporate Credit Card Program**").

138.    Pursuant to the WEX Corporate Credit Card Program, the Debtors are authorized to issue MasterCard accounts (the "**MasterCard Accounts**") and WEX Universal accounts (the "**WEX Universal Accounts**") to their employees for general purchases of goods and services for fuel purchases from unattended automated fueling facilities, onsite fueling facilities, and privately-owned fueling site location(s). The Debtors have the option to restrict the purchases that can be made using the WEX Universal Accounts, including limiting the amount that can be charged in a single purchase. In addition, the Debtors are eligible for certain financial incentives under the WEX Corporate Credit Card Program.

139.    The WEX Corporate Credit Card Program is subject to a $500,000 credit limit. Payment under the WEX Corporate Credit Card Program is due 25 days from invoice for the MasterCard Accounts, and 26 days after invoice for the Universal Fleet Card accounts. On average, the Debtors spend between $300,000 and $500,000 per week using the WEX Corporate Credit Card Program. As of the Petition Date, the current amount outstanding on account of the WEX Corporate Credit Card Program was $75,000.

(ii)     **WellsOne Commercial Card Program**

140.     Debtor CUSA, LLC and Wells Fargo Bank, National Association ("**Wells Fargo**") are parties to a Commercial Card Agreement dated as of October 19, 2007, as may have been amended from time to time (as amended, (the "**WellsOne Commercial Card Program**"). Pursuant to the WellsOne Commercial Card Program, the Debtors are authorized to issue WellsOne commercial cards (the "**WellsOne Commercial Cards**") to their employees for general purchases of goods and services.  The Debtors have the option to restrict the purchases that can be made using the WellsOne Commercial Cards, including limiting the amount that can be charged in a single purchase.

141.     The WellsOne Commercial Card Program is subject to a $700,000 credit limit.  Payment under the WellsOne Commercial Card Program is due on the tenth (10th) day of each month.  As of the Petition Date, the current amount outstanding on account of the WellsOne Commercial Card Program was $200,000.

**N.     MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 1107(a) AND 1108 (A) AUTHORIZING DEBTORS TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN COMMON CARRIERS AND OTHER SUBCONTRACTORS AND (B) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECK AND ELECTRONIC PAYMENT REQUESTS (the "Lien Claimants Motion")**

142.     By the Lien Claimants Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay the prepetition claims of Common Carriers and Subcontractors, up to a maximum of $1.15 million  in the aggregate and $500,000 during the interim period, in accordance with the procedures set forth in the Lien Claimants Motion.

143.     In the ordinary course of business, the Debtors do business with common carriers, shippers, warehousemen, truckers, shipping auditing services, customs brokers and customs agents (collectively, the "**Common Carriers**") that ship, transport, store and deliver raw materials (primarily, spare parts and other goods for the Debtors' motor coaches) used in the

Debtors' operations. Most of the Common Carriers have contracts with the Debtors.   Certain common Carriers are hired on an as-needed basis.  The Common Carriers are generally not paid in advance, but rather invoice the Debtors for services previously rendered.

144.    The Debtors rely extensively on the Common Carriers to deliver components, parts, and equipment to the Debtors' facilities and to store parts and other materials, if necessary, during transit. The services provided by these Common Carriers are critical to the Debtors' ability to maintain their motor coaches and otherwise to operate their business.

145.    Furthermore, in the ordinary course of their business, the Debtors also do business with contractors and vendors that install, repair and/or provide parts for the Debtors' motor coaches (collectively, the "**Subcontractors**").

146.    Although the Debtors generally make timely payments to the Common Carriers and Subcontractors, some Common Carriers and/or Subcontractors may not have been paid for prepetition services for which payment was not yet due as of the Petition Date.  Absent timely payments, these Common Carriers and Subcontractors may be entitled under applicable non-bankruptcy law to assert possessory liens on the goods in their possession, which secure the charges or expenses incurred in connection with the transportation or storage of the goods.[8] Moreover, notwithstanding the automatic stay under section 362 of the Bankruptcy Code, the Subcontractors may have a right to assert and perfect materialmen's, mechanic's, artisan's, or other liens (collectively, the "**Subcontractor Liens**") against the Debtors' property.

147.    The Debtors estimate that, as of the Petition Date, amounts owed to Common Carriers for prepetition goods or services total approximately $10,000 (the "**Common Carrier Claims**")[9] and amounts owed to Subcontractors (excluding Common Carrier Claims,

---

[8]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. § 7-307(1).

[9]    Common Carrier Claims include warehousemen's liens.

which obligations have given or could give rise to a Subcontractor lien against the Debtors or their property, ) total approximately $1.15 million (the "**Subcontractor Lien Claims**").

148.    The goods and services provided by the Common Carriers and the Subcontractors are essential to the Debtors' business.  If the Common Carriers and/or the Subcontractors refuse to continue providing their services to the Debtors on reasonable terms, or if they assert possessory liens on the Debtors' motor coaches and other property, the Debtors' efforts in these Chapter 11 Cases will be compromised.

**Common Carrier Claim And Subcontractor Lien Payment Procedures**

149.    The Debtors seek to pay, and consequently discharge, the Common Carrier Claims and Subcontractor Lien Claims pursuant to the following procedures:

(a)    Debtors' Sole Discretion.    The Debtors, in their sole discretion, shall determine, in the exercise of their business judgment, which Common Carriers and Subcontractors, if any, are entitled to payment under the Lien Claimants Motion.  Prior to making a payment to a party under the Lien Claimants Motion, the Debtors may in their discretion, settle all or a portion of the Common Carrier Claims or Subcontractor Lien Claims for less than their face amount without further notice or hearing.

(b)    Agreed Trade Terms.  The Debtors may condition payment of Common Carrier Claims or Subcontractor Lien Claims on the agreement of the Common Carriers and Subcontractors to continue supplying goods and services to the Debtors on the same trade terms that were in effect prior to the Petition Date.  The Debtors reserve the right to negotiate new trade terms with any Common Carriers or Subcontractors as a condition to payment of any Common Carrier Claim or Subcontractor Lien Claim.  The Debtors shall have the right, on a case-by-case basis, to request written acknowledgement from Common Carriers and Subcontractors of the trade terms to which the parties have agreed.

(c)    Subcontractor Lien Claims. With respect to Subcontractor Lien Claims only, the Debtors shall have authority to pay a Subcontractor Lien Claim when, if the Debtors determine, in their discretion, that imposition of a lien would unduly disrupt the Debtors' business; provided, however, that, with respect to a Subcontractor: (i) the Debtors shall not pay such Subcontractor Lien Claim unless the Subcontractor has perfected or, in the Debtors' judgment, is presently capable of perfecting or will be capable of perfecting in the future a lien or liens (not subject to avoidance) with respect to the Subcontractor Lien Claim; (ii) the payment of such

Subcontractor Lien Claim shall be made with a full reservation of rights regarding the extent, validity, perfection or possible avoidance of any liens; and (iii) the Subcontractor agrees to promptly release any filed liens upon payment of its Subcontractor Lien Claim

(d)    <u>Breach of Agreed Trade Terms</u>.  To the extent a Common Carrier or Subcontractor refuses to comply with agreed trade terms, any payment made to such Common Carrier or Subcontractor on account of a Common Carrier Claim or Subcontractor Lien Claim shall be deemed to have been in payment of the then outstanding post-petition obligations owed to such Common Carrier or Subcontractor, and such Common Carrier or Subcontractor shall be required to immediately repay to the Debtors any payment made to it on account of its prepetition claim to the extent the aggregate amount of such payments exceeds the post-petition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

150.    Finally, the Debtors request that all banks and other financial institutions on which checks to the Common Carriers and the Subcontractors are drawn be authorized and directed to receive, process, honor and pay any and all such checks, whether presented prior to or after the Petition Date, upon each such bank receiving notice of such authorization.  In addition, the Debtors request authority to issue post-petition checks as necessary to replace any prepetition checks issued with respect to the Common Carrier Claims that may be dishonored.

O.    **MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO FED. R. BANKR. P. 1007(b) AND (c) AND DEL. BANKR. L.R. 1007-1(b) EXTENDING THE TIME WITHIN WHICH THE DEBTORS MUST FILE THEIR SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS (the "<u>Schedules Extension Motion</u>")**

151.    The Debtors seek the entry of an order, pursuant to Rules Bankruptcy Rules 1007(b) and (c) and Local Rule 1007-1(b), setting a deadline of sixty (60) days after the Petition Date by which the Debtors must file their respective Schedules and Statements, in accordance with section 521 of the Bankruptcy Code, without prejudice to the Debtors' right to seek further extensions of such periods upon a showing of cause therefor pursuant to Bankruptcy Rule 1007 and Local Rule 1007-1(b).

152.    Completing the Schedules and Statements requires the Debtors to collect, review and assemble a substantial amount of information.  The Debtors' business is a large and

complex enterprise, with potentially thousands of creditors and other parties in interest.  While the Debtors maintain extensive books and records and a sophisticated computerized accounting system and the Debtors' management and employees and outside legal and financial advisors have been working diligently to compile the information necessary to complete the Schedules and Statements, due to the size and complexity of the Chapter 11 Cases, and the fact that the Debtors have operations throughout the United States, the Debtors submit that cause exits for the Court to grant the extension requested in the Schedules Extension Motion.  The magnitude of the task, when taken together with the considerable stresses of preparing for the filing of the Chapter 11 Cases, the anticipated burdens of preparing the Debtors' transition into chapter 11, and the pre-existing, ongoing responsibilities of operating the Debtors' business day-to-day, supports an extension of the deadline set forth in the Bankruptcy Rules for filing the Schedules and Statements.

153.    The relief requested in the Schedules Extension Motion will not prejudice or adversely affect the rights of the Debtors' creditors or other parties-in-interest. No bar date for the filing of proofs of claim has yet been set in this case and the Debtors do not anticipate asking the Court to set a bar date in the near term.  Rather, the 30-day additional extension requested in the Schedules Extension Motion will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of the Chapter 11 Cases.

**P.    MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 105(a), FED. R. BANKR. P. 1015 AND DEL. BANKR. L.R. 1015-1 APPROVING JOINT ADMINISTRATION OF CASES AND GRANTING RELATED RELIEF (the "<u>Joint Administration Motion</u>")**

154.    The Debtors seek the joint administration and consolidation of the Chapter 11 Cases for procedural purposes only pursuant to section 105(a) of the Bankruptcy Code, Rule 1015(b) of the Bankruptcy Rules and Local Rule 1015-1.  The Debtors believe that, in light of their affiliated status and interrelated business operations (as described below), the joint handling

of the administrative matters respecting these cases – including, without limitation, the use of a single docket for matters occurring in the administration of the estates and the combining of notices to creditors – will aid in expediting these Chapter 11 Cases and rendering their administration more efficient and economical.

155.    These cases should be administered jointly because joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby save considerable time and expense for the Debtors, their estates and all parties in interest.

156.    The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these Chapter 11 Cases will affect more than one of the Debtors.  The failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue to be served upon separate service lists.  Such duplication of substantially identical documents would be extremely wasteful.

157.    Joint administration will permit the Clerk to use a single general docket for all of the above-referenced cases and to combine notices to creditors of each Debtor's estate and other parties in interest.  Joint administration will also protect parties in interest by ensuring that parties in interest in each Chapter 11 Case will be apprised of the various matters before the Court in the other cases.

158.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduced costs that will result from the joint administration of these cases.  The Court will also be relieved of the burden of entering duplicative orders and maintaining redundant files.

159.    The Debtors also submit that supervision of the administrative aspects of the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware will be simplified.

160.    Accordingly, the Debtors submit that joint administration of the above-referenced Chapter 11 Cases is in their best interests, as well as the best interests of its creditors and all other parties in interest.

161.    The Debtors also seek authority to file the monthly operating reports required by the United States Trustee on a consolidated basis, provided that separate allocations of disbursements will be made for each Debtor.

## CONCLUSION

162.    The Debtors' ultimate goal in these chapter 11 cases is to restructure their debt obligations to enable them to satisfy the claims of the Prepetition Secured Parties, vendors and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code or a sale of the Debtors' assets. In the near term, however, to minimize any loss of value of their business during these chapter 11 cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these proceedings, with as little interruption or disruption to the Debtors' operations as possible.

163.    I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization or sale of the Debtors' businesses will be substantially enhanced.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

Respectfully submitted,

**COACH AM GROUP HOLDINGS CORP.,** *et al.*

_____*/s/ Brian Cejka*_____

By: Brian Cejka
Title: Chief Restructuring Officer

Dated: January 3, 2012