## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| COACH AM GROUP HOLDINGS CORP., _et al._.[1] | Case No. 12-10010 (KG) |
| Debtors. | (Jointly Administered) |

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 349 AND 1112(b) AND FED. R. BANKR. P. 1017(a) (A) APPROVING THE TRUST AGREEMENTS, (B) AUTHORIZING THE TRANSFER OF REMAINING ASSETS TO THE LENDER TRUSTEE, (C) DISMISSING THE DEBTORS' CHAPTER 11 CASES AND (D) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their counsel, submit this motion (the "**Motion**"), for entry of an order, substantially in the form submitted herewith (the "**Proposed Order**"), pursuant to sections 105(a), 349 and 1112(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and rule

---

[1]    Coach Am Group Holdings Corp. (4830); Coach Am Holdings Corp. (1816); Coach America Holdings, Inc. (2841); American Coach Lines, Inc. (2470); America Charters, Ltd. (8246); CUSA Atlanta, Inc. (4003); American Coach Lines of Jacksonville, Inc. (0136); American Coach Lines of Miami, Inc. (7867); American Coach Lines of Orlando, Inc. (0985); Coach America Group, Inc. (2816); B & A Charter Tours, Inc. (9392); CUSA Dillon's, Inc. (5559); Florida Cruise Connection, Inc. (9409); Hopkins Airport Limousine Services, Inc. (1333); CUSA LL, Inc. (5309); The McMahon Transportation Company (0030); Midnight Sun Tours, Inc. (2791); Royal Tours of America, Inc. (2313); Southern Coach Company (6927); Tippet Travel, Inc. (8787); Trykap Airport Services, Inc. (0732); Trykap Transportation Management, Inc. (2727); KBUS Holdings, LLC (6419); ACL Leasing, LLC (2058); CAPD, LLC (4454); Coach America Transportation Solutions, LLC (6909); CUSA, LLC (3523); CUSAASL, LLC (2030); CUSA AT, LLC (2071); CUSAAWC, LLC (2084); CUSABCCAE, LLC (2017); CUSA BESS, LLC (3610); CUSA CC, LLC (1999); CUSACSS, LLC (9896); CUSA EE, LLC (1982); CUSA ELKO, LLC (4648); CUSAES, LLC (1941); CUSA FL, LLC (1920); CUSAGCBS, LLC (1891); CUSAGCT, LLC (1833); CUSAKBC, LLC (1808); CUSA K-TCS, LLC (1741); CUSA Leasing, LLC (1321); CUSAPCSTC, LLC (1701); CUSAPRTS, LLC (1591); CUSARAZ, LLC (0640); CUSA Transit Services, LLC (8847); Get A Bus, LLC (1907); Coach BCCAE, L.P. (3488); Coach Leasing BCCAE, L.P. (6784). The Debtors' corporate offices are located at 8150 North Central Expressway, SuiteM1000, Dallas, Texas75206.

1017(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (a) approving the Trust Agreements (as defined below), (b) authorizing the transfer of assets to the Lender Trustee (as defined below) to be held in trust for the Beneficiary (as defined in the Lender Trust Agreement) subject to the terms of the Lender Trust Agreement, (c) dismissing the Debtors' chapter 11 cases (collectively, the "**Chapter 11 Cases**")[2] and (d) granting related relief.   In support of the Motion, the Debtors respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Debtors have worked diligently throughout these Chapter 11 Cases to sell their businesses as going concerns.  By doing so, the Debtors have preserved thousands of jobs, provided on-going customers and vendors for myriad counterparties and maximized recovery to the Debtors' secured lenders and general unsecured creditors.  This successful result was achieved through a competitive auction process and a series of five going-concern sale transactions to different bus operators across the country.

As a part of this process and in accordance with the DIP Order (as defined below), the GUC Trust (as defined below) was established and funded to provide recoveries for general unsecured creditors.  Thus, while general unsecured creditors will receive a recovery from a carve-out of the Prepetition Secured Parties' (as defined below) collateral, the sales did not yield sufficient proceeds to fully repay the Prepetition Secured Parties, and the Debtors do not have sufficient funds to confirm a chapter 11 plan.  Instead, the Debtors would propose to wind down their remaining assets in an orderly manner.  To facilitate the wind-down, the Prepetition First Lien Lenders (as defined below) have agreed to fully-fund the Wind-Down Expenses (as defined below), including the full payment of United States Trustee fees, professional fees and expenses,

---

[2]    As set forth in the Proposed Order, notwithstanding the dismissal of the Chapter 11 Cases, this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or relating to the implementation of this or any other Order of this Court entered in the Chapter 11 Cases, to adjudicate final fee applications and related issues of professionals retained in the Chapter 11 Cases and to adjudicate any objections to claims filed on behalf of theGUC Trustee.

ordinary course trade payables, and other wind-down expenses.  Accordingly, the Debtors seek the entry of an order dismissing the Chapter 11 Cases and granting related relief to effectuate the dismissal and transfer of the Remaining Assets (as defined below).

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated February 29, 2012 (Sleet, C.J.). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought herein are sections 105(a), 349 and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017(a).

## BACKGROUND

### A.      General Background

3.      On January 3, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their remaining business and manage their remaining properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

5.      By order dated January 5, 2012, this Court authorized the joint administration of the Chapter 11 Cases.  *See* Docket No. 44.

6.      On January 13, 2012, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**") pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See* Docket No. 92.

### B.      Prepetition Indebtedness

#### (i)      First Lien Credit Facility

7.      Prior to the Petition Date, Debtor Coach America Holdings, Inc. ("**Borrower**") entered into that certain Amended and Restated First Lien Credit Agreement dated

as of April 20, 2007 and amended and restated as of February 18, 2011 (as amended, supplemented or otherwise modified, the "**Prepetition First Lien Credit Agreement**"), among Coach Am Holdings Corp. ("**Holdings**"), Borrower, the lenders from time to time a party thereto (the "**Prepetition First Lien Lenders**") and JPMorgan Chase Bank, N.A. ("**JPMCB**"), in its capacity as administrative agent and collateral agent for the Prepetition First Lien Lenders (the "**Prepetition First Lien Agent**").  The Debtors also entered into that certain Amended and Restated First Lien Guarantee and Collateral Agreement dated as of April 20, 2007 as amended and restated as of February 18, 2011 among Holdings, Borrower, each subsidiary party thereto and JPMCB, in its capacity as collateral agent (as heretofore amended, supplemented or otherwise modified, the "**First Lien Guarantee and Collateral Agreement**", and collectively with the Pre-Petition First Lien Credit Agreement, and the mortgages and all other documentation executed in connection therewith (including, for the avoidance of doubt, any Specified Hedge Agreements (as defined in the Prepetition First Lien Credit Agreement), if any), the "**Existing First Lien Agreements**"). Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders agreed to extend certain loans to and issue letters of credit including (a) a term loan in the aggregate principal amount of $245 million (b) a funded letter of credit commitment in the aggregate amount of $50 million and (c) a revolving credit facility in the aggregate principal amount of up to $30 million, which includes a $10 million subfacility for revolving letters of credit.

8.    As of the Petition Date, the Debtors were indebted and liable to the Prepetition First Lien Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $238,346,317.36 in respect of term loans made, in the aggregate principal amount of approximately $24,383,347.39 in respect of revolving loans made, in the aggregate face amount of approximately $6 million in respect of revolving letters of credit issued and outstanding and in the aggregate face amount of approximately $50 million in respect of funded letters of credit issued and outstanding, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees

that are chargeable or reimbursable under the Existing First Lien Agreements), charges and other obligations incurred in connection therewith as provided in the Existing First Lien Agreements (collectively, the "**Prepetition First Lien Debt**"), in each case pursuant to, and in accordance with the terms of the Existing First Lien Agreements.

9.     The Prepetition First Lien Debt is secured by first priority liens on and continuing security interests in (the "**Prepetition First Priority Liens**") substantially all of the Debtors' assets (excluding real property) (collectively, the "**Prepetition Collateral**") pursuant to the First Lien Guarantee and Collateral Agreement.

**(ii)     Second Lien Credit Facility**

10.     Prior to the Petition Date, Borrower entered into that certain Amended and Restated Second Lien Credit Agreement dated as of April 20, 2007 and amended and restated as of February 18, 2011 (as heretofore amended, supplemented or otherwise modified, the "**Prepetition Second Lien Credit Agreement**" and together with the Prepetition First Lien Credit Agreement, the "**Prepetition Credit Agreements**") among Borrower, Holdings, the lenders from time to time a party thereto (the "**Prepetition Second Lien Lenders**" and together with the Prepetition First Lien Lenders, the "**Prepetition Lenders**") and The Bank of New York Mellon ("**BONY**") in its capacity as administrative agent and collateral agent (the "**Prepetition Second Lien Agent**" and together with the Prepetition First Lien Agent and the Prepetition Lenders, the "**Prepetition Secured Parties**").  The Debtors also entered into that certain Second Lien Guarantee and Collateral Agreement dated as of April 20, 2007 and amended and restated as of as of February 18, 2011 among Holdings, as the Borrower, each subsidiary party thereto and BONY, as collateral agent (as heretofore amended, supplemented or otherwise modified, the "**Second Lien Guarantee and Security Agreement**", and collectively with the Prepetition Second Lien Credit Agreement, and the mortgages and all other documentation executed in connection therewith, the "**Existing Second Lien Agreements**" and, together with the Existing First Lien Agreements, the "**Existing Agreements**").  Pursuant to the Prepetition Second Lien

Credit Agreement, the Prepetition Second Lien Lenders agreed to extend a term loan in the aggregate principal amount of $55 million.

11.    As of the Petition Date, the Debtors owed approximately $30.5 million with respect to the term loan under the Prepetition Second Lien Credit Agreement plus accrued and unpaid interest thereon and all other liabilities and obligations arising out of or in connection with the Prepetition Second Lien Credit Agreement (collectively, the "**Prepetition Second Lien Debt**" and together with the Prepetition First Lien Debt, the "**Prepetition Debt**").

12.    The Second Lien Debt is secured by second priority liens on and security interests in (the "**Prepetition Second Priority Liens**") the Prepetition Collateral pursuant to the Second Lien Guarantee and Collateral Agreement.

## C.    **Post-Petition Financing**

13.    On the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 36; and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (c)* [Docket No. 20] (the "**DIP Motion**").

14.    On January 5, 2012, the Court entered the *Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 58].

15.    On March 19, 2012, the Court entered the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362,*

*364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (III) Granting Related Relief* [Docket No. 444] (the "**Final DIP Order**").

16.     Pursuant to the Final DIP Order, the Debtors were authorized, among other things, to (i) obtain post-petition financing up to the aggregate principal amount of $30,000,000 from JPMorgan Chase Bank, N.A., acting as Administrative Agent and Collateral Agent (in such capacities, the "**DIP Agent**"), for itself and a syndicate of financial institutions (together with the DIP Agent, the "**DIP Lenders**") in accordance with the terms of that certain Superpriority Debtor-in-Possession Credit Agreement, dated January 5, 2012 (as amended, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**") and (ii) use Cash Collateral (as defined in the Final DIP Order) and all other collateral in which the Prepetition Lenders have an interest, and (a) the Prepetition First Lien Lenders were granted adequate protection under or in connection with the Prepetition First Lien Credit Agreement and (b) the Prepetition Second Lien Lenders were granted adequate protection under or in connection with the Prepetition Second Lien Credit Agreement, with respect to, *inter alia*, such use of the Prepetition Lenders' Cash Collateral and all use and diminution in the value of the Prepetition Collateral (as defined in the Final DIP Order).

17.     In the Final DIP Order, the Court determined that the Prepetition First Lien Agent, on behalf of itself and the Prepetition First Lien Lenders, has valid, binding, enforceable and perfected first-priority liens on substantially all of the Debtors' assets, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, immediately junior to the DIP Liens (as defined in the Final DIP Order). *See* Final DIP Order ¶ 3(b).

18.     Pursuant to the Coach USA Sale Order (defined below), upon the Coach USA Closing Date (defined below), the Debtors were authorized and directed to pay to the DIP Agent, for the benefit of itself and the DIP Lenders, the amount equal to the outstanding DIP

Obligations (as defined in the Final DIP Order).  As of the Coach USA Closing Date, there were no outstanding DIP Obligations.  *See* Coach USA Sale Order, ¶ 32(c).  Accordingly, the Revolving Termination Date (as defined in the Final DIP Order) occurred on the Coach USA Closing Date pursuant to and in accordance with the DIP Credit Agreement.

**D.**     **The GUC Trust**

19.     In connection with the DIP Motion, the Creditors' Committee raised certain objections and issues including, among other things, potential claims and causes of action against the Prepetition Lenders and the eventual treatment of the Debtors' general unsecured creditors at the conclusion of the Chapter 11 Cases.

20.     The Debtors, the DIP Agent, on behalf of itself and the DIP Lenders, the Prepetition First Lien Agent, on behalf of itself and the Prepetition First Lien Lenders, and the Creditors' Committee entered into negotiations to resolve the Creditors' Committee's objections. These negotiations culminated in the parties' agreement to resolve the Creditors' Committee's objections on the terms and conditions embodied in the Final DIP Order.  The comprehensive settlement embodied in the Final DIP Order authorized, among other things, the formation of a trust for the benefit of the Debtors' general unsecured creditors (the "**GUC Trust**"), which would be funded by a portion of the Prepetition Collateral that the Prepetition First Lien Lenders agreed to carve out for the benefit of the General  Unsecured Creditors (as defined below).

21.     As set forth in the Final DIP Order, the GUC Trust is to be administered by an individual or entity (the "**GUC Trustee**") who will hold certain funds (the "**GUC Trust Funds**") in a separate account (the "**GUC Trust Account**") which, in addition to satisfying the fees, costs and expenses of the GUC Trustee and the administration of the GUC Trust, shall be disbursed by the GUC Trustee to (i) holders of allowed general unsecured claims in these Cases other than on account of any deficiency claim under the Existing Agreements (the "**General Unsecured Creditors**") and (ii) the Creditors' Committee's professionals on account of Professional Fees (as defined in the Final DIP Order).

22.  Pursuant to paragraph 19(b) of the Final DIP Order, the GUC Trust Funds are comprised of the following, all of which constitute proceeds of the Prepetition Collateral:

(i)  $1,750,000, minus any Professional Fees paid to counsel or financial advisors to the Creditors' Committee prior to the GUC Trust Funding Date; plus

(ii)  one-half (.5) percent of the value of any net sale proceeds in excess of the first amount, and less than the second amount, set forth in the sale proceeds side letter dated March 12, 2012 among counsel to the Debtors, counsel to the DIP Agent and the Prepetition First Lien Agent and counsel to the Creditors' Committee attached hereto as **Exhibit A** (the "**Sale Proceeds Side Letter**") and one (1) percent of the value of any net sale proceeds in excess of the second amount set forth in the Sale Proceeds Side Letter, subject to the terms and conditions of paragraph 19(b)(ii) of the Final DIP Order; plus

(iii)  seven and one-half (7.5) percent of the difference (if positive) of (x) the aggregate dollar amounts included in the Approved Budget (as defined in the DIP Credit Agreement) under the line items, "Critical Vendor/Lien Holder Payments", "Fuel Vendor Motion" and "Customer Programs" less (y) the amount paid to the holders of allowed claims of the types covered by such line items.

Final DIP Order, ¶ 19(b)(i)-(iii).

23.  In order to effectuate the settlement memorialized in the Final DIP Order, on February 1, 2013, the Debtors, Solution Trust (as the GUC Trustee) and the Creditors' Committee entered into the Coach Am Group Holdings Corp. et al. General Unsecured Creditors Trust Agreement attached hereto as **Exhibit B** (the "**GUC Trust Agreement**"). On February 4, 2013, as authorized under the Final DIP Order and the Coach USA Sale Order, the Debtors transferred $1,750,000 of the Prepetition Collateral to the GUC Trustee for deposit into the GUC Trust Account. At the agreement of the parties, the calculated portion of the GUC Trust Funds, as set forth in paragraphs 19(b)(ii) and (iii) of the Final DIP Order, will be transferred to the GUC Trustee, as authorized under the Final DIP Order and the Coach USA Sale Order, upon the dismissal of the Debtors' Chapter 11 Cases.

**E.**      **Sale of Substantially All of the Debtors' Operating Assets**

24.      On January 13, 2012, the Debtors filed the *Motion of the Debtors for Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Sale Notices, and (C) Sale Hearing Date, and (II) Authorizing and Approving (A) Sale of Substantially All of the Assets Free and Clear of Liens, Claims, and Encumbrances, and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 102] (the "**Sale Motion**").[3]

25.      On January 27, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014 Approving (I) Bidding Procedures, (II) Form and Manner of Sale Notices, and (III) Sale Hearing Date* [Docket No. 161] (the "**Bidding Procedures Order**").

26.      Pursuant to the Bidding Procedures Order, the Debtors conducted various auctions and asset sales which resulted in the sale of substantially all of the Debtors' operating assets for over $180 million.

**(i)**      **The LADOT Contract Sale**

27.      On May 25, 2012, the Court entered an order [Docket No. 758] approving MV Transportation as the successful bidder for the *Agreement For The Operations Of The City Of Los Angeles, Department Of Transportation's (LADOT) Bus Transit Operation Services For The North Region Of The Combined Services Request For Proposals* (the "**LADOT Contract Sale**"). The LADOT Contract Sale closed on June 1, 2012.

**(ii)**      **The Coach USA Sale**

28.      On May 25, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Authorizing and Approving (I) Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims, and Encumbrances and (II) Assumption and Assignment of Certain Executory Contracts and*

---

[3]      In connection with the Sale Motion, on January 27, 2012, the Court entered an order directing the appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code. The consumer privacy ombudsman's report has not been filed with the Court.

*Unexpired Leases* [Docket No. 762] (the "**Coach USA Sale Order**") authorizing the sale of substantially all of the assets of Debtors Coach America Holdings, Inc., Lakefront Lines, Inc., American Coach Lines of Atlanta, Inc., CUSAKBC, LLC, CUSAPCSTC, LLC, CUSAPRTS, LLC, CUSA ELKO, LLC, Dillon's Bus Service, Inc., CUSARAZ, LLC, CUSAAWC, LLC, CUSA AT, LLC to Coach USA, Inc. (the "**Coach USA Sale**"). The Coach USA Sale closed on July 21, 2012 (the "**Coach USA Closing Date**").

       **(iii)**    **The PTI Sale**

       29.    On May 25, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Authorizing and Approving (I) Sale of Substantially All of the Assets of Debtors CUSAES, LLC and CUSACSS, LLC Free and Clear of Liens, Claims, and Encumbrances and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 761] authorizing the sale of substantially all of the assets of Debtors CUSAES, LLC AND CUSACSS, LLC to Professional Transportation, Inc. (the "**PTI Sale**"). The PTI Sale closed on August 23, 2012.

       **(iv)**    **The TMS Sale**

       30.    On May 25, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Authorizing and Approving (I) Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims, and Encumbrances and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 760] authorizing the sale of substantially all of the assets of Debtors CUSAASL, LLC, CUSABCCAE, LLC, CUSA CC, LLC, CUSA FL, LLC, CUSAGCBS, LLC, CUSA K-TCS, LLC, CUSA Transit Services, LLC, CUSAGCT, LLC, America Charters, Ltd, American Coach Lines of Jacksonville, Inc., Midnight Sun Tours, Inc., American Coach Lines of Orlando, Inc., American Coach Lines of Miami, Inc. and Trykap Transportation Management, Inc. to Transportation Management Services, Inc. (the "**TMS Sale**"). The TMS Sale closed on September 12, 2012.

(v)     **The El Expreso Sale**

31.     On May 25, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Authorizing and Approving (I) Sale of Substantially All of the Assets of Debtor CUSA EE, LLC Free and Clear of Liens, Claims, and Encumbrances and (II) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 759] authorizing the sale of substantially all of the assets of Debtor CUSA EE, LLC to Tornado Bus Company (the "**El Expreso Sale**").  The El Expreso Sale closed on September 13, 2012.

F.     **Residual Asset Sales**

32.     Following the sale of substantially all of their operating assets, the Debtors were left with certain residual assets that were not purchased under any of the previously approved asset sales.  Accordingly, in an effort to maximize value for their estates, the Debtors sought authority to sell these assets to various purchasers.

(i)     **Sale of Brandon Woods Property**

33.     On November 27, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002, 6004 and 9014 Authorizing the Sale of Real Property Subject to Higher and Better Offers and Granting Related Relief* [Docket No. 1113] authorizing the sale of real property and the buildings, fixtures and other improvements located thereon, if any located in Anne Arundel County, Maryland, more particularly described as Lots 1A, 1B and 1C as shown on a Plat entitled, "Resubdivision of Lots 1 and 2 Brandon Woods Business Park Phase 1 Section 1 Industrial Subdivision, 3rd District Anne Arundel County, MD" to CD Resource Court, LLC for $275,000.

(ii)    **Residual Motorcoach Sales**

34.     On October 12, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Establishing Procedures for the Sale of Residual Motorcoaches* [Docket No. 1147] (the "**Residual Motorcoach Sale Procedures Order**").  Pursuant to the Residual

Motorcoach Sale Procedures Order, the Debtors sold five (5) motorcoaches to various purchasers for $1,339,900 in the aggregate.

(iii)    **Sale of Interchange Litigation Claim**

35.    On March 5, 2013, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002, 6004 and 9014 Authorizing the Sale of Debtor CUSA LLC's Right to Payment Under the Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation Free and Clear or All Liens, Claims and Encumbrances and Granting Related Relief* [Docket No. 1432] authorizing the sale of Debtor CUSA, LLC's right to payment under under the class action litigation entitled *In re: Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation*, Case No. 05-MD-01720 (JG) (JO) to Cascade Settlement Services LLC for $40,500.

G.    **De Minimis Asset Sales**

36.    As is standard in chapter 11 cases of this size, the Debtors also sought authority to sell or otherwise dispose of certain de minimis assets during the pendency of the Chapter 11 Cases without further Court approval.  On March 19, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 554 Establishing Procedures for the Sale or Abandonment of De Minimis Assets* [Docket No. 448] (the "**De Minimis Asset Procedures Order**").

37.    Pursuant to the De Minimis Asset Procedures Order, to date the Debtors have sold de minimis assets totaling $374,350.

H.    **The Wind-Down Budget**

38.    Pursuant to the Coach USA Sale Order, upon the Coach USA Closing Date, the Debtors were authorized and directed to deposit into a segregated account (the "**Wind-Down Carve Out Account**") an amount carved out of the proceeds of the Prepetition First Lien Lenders' collateral equal to (i) all of the Debtors' professional fees and expenses incurred on or prior to the Coach USA Closing Date, whether or not yet allowed by an Order of the Court, (ii)

fees payable to the United States Trustee calculated in accordance with 28 U.S.C. § 1930(a)(6); (iii) the amount of any valid unpaid ordinary course trade payables incurred by the Debtors between the Petition Date and the Coach USA Closing Date (except to the extent assumed by Coach USA, Inc. or any other purchaser) and (iv) a reasonable estimate of all wind-down costs and expenses (including professionals' fees and expenses) estimated to be incurred by the Debtors after the Coach USA Closing Date((i), (ii), (iii) and (iv) together, the "**Wind-Down Expenses**"), which amount, in the case of clause (iv) only, shall be acceptable to the Required Lenders (as defined in the Coach USA Sale Order) in their sole discretion, to be disbursed in accordance with a budget in form and substance satisfactory to the Required Lenders and to be submitted by the Debtors prior to the Coach USA Closing Date (the "**Wind-Down Budget**"). *See* Coach USA Sale Order, ¶ 32(d).

        39.    As of the date of this Motion, the Debtors have disbursed approximately $33.8 million from the Wind-Down Carve Out Account in accordance with the Wind-Down Budget. The Debtors estimate that the following amounts remain to be paid in accordance with the Wind-Down Budget (such amounts, in each case, less any amounts paid prior to entry of the Proposed Order, collectively, the "**Holdback Amount**"):

    (a)    United States Trustee fees pursuant to 28 U.S.C. § 1930(a)(6) of approximately $75,000;

    (b)    The unpaid portion of allowed professional fees and expenses and an estimate of professional fees and expenses incurred during the Chapter 11 Cases of approximately $3.3 million;[4]

---

[4]    As set forth in the Proposed Order, the Debtors request that the Court schedule a final omnibus fee hearing (the "**Final Fee Hearing**") to be held within forty-five (45) days of entry of the Proposed Order.  All professionals retained in the Chapter 11 Cases will be required to file final requests for allowance and payment of all fees and expenses incurred during the Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware and the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 157] so as to be heard at the Final Fee Hearing.

(c)   Unpaid ordinary course trade payables incurred by the Debtors between the Petition Date and the Coach USA Closing Date of approximately $200,000;

(d)   Wind-down expenses incurred by the Debtors between the Coach USA Closing Date and the date of entry of the Proposed Order, including, but not limited to, rent, utilities, consulting fees of approximately $437,000; and

(e)   Wind-down expenses arising subsequent to the entry of the Proposed Order, including, but not limited to, the fees to prepare final tax returns and dissolution costs, and for no other purposes of approximately $250,000.

40.    Pursuant to the Coach USA Sale Order, unless and until the Pre-Petition First Lien Obligations (as defined in the Final DIP Order) have been paid in full in cash, the Prepetition First Lien Agent has a first priority lien on the Wind-Down Carve Out Account and the proceeds thereof.  *See* Coach USA Sale Order, ¶ 33.

## I.    Payments to the Prepetition First Lien Lenders

41.    Pursuant to the Coach USA Sale Order, upon the Coach USA Closing Date, the Debtors were authorized and directed to pay to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, the remaining net cash proceeds from the sale for application to the Prepetition First Lien Debt (as defined in the Final DIP Order) in accordance with section 6.5 of the First Lien Security Agreement (as defined in the Final DIP Order) until the Prepetition First Lien Debt has been paid in full in cash.  *See* Coach USA Sale Order, ¶ 32(e).

42.    As of the date of this Motion, the Debtors have paid $168,534,000 to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders in accordance with paragraph 32(e) of the Coach USA Sale Order, which represents a recovery of approximately 52.3% for the Prepetition First Lien Lenders on their stated claim.

43.    Pursuant to the Coach USA Sale Order, the Debtors are now required to pay to the Prepetition First Lien Agent all cash beneficially owned by the Debtors or thereafter received from the sale or other monetization of the Debtors' assets or otherwise.  *See* Coach

USA Sale Order, ¶ 32.  Accordingly, upon dismissal of these Chapter 11 Cases, the Debtors propose to transfer the remaining GUC Trust Funds to the GUC Trustee and transfer all remaining assets of any kind or nature whatsoever, whether liquidated or contingent, (such assets, other than the remaining GUC Trust Funds and the Holdback Amount, the "**Remaining Assets**")[5] to a liquidating trust established for the benefit of the Prepetition First Lien Lenders (the "**Lender Trust**") pursuant to a trust agreement substantially in the form of  the trust agreement attached hereto as **Exhibit C** (the "**Lender Trust Agreement**", together with the GUC Trust Agreement, the "**Trust Agreements**").

**J.**      **Bar Dates**

44.      On February 10, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a) and 503(b)(9), Fed. R. Bankr. P. 2002 and 3003(c)(3) and Del.Bankr. L.R. 2002-1(e) (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 213] (the "**General Bar Date Order**").  Pursuant to the General Bar Date Order, April 2, 2012 at 5:00 p.m. (prevailing Eastern time) (the "**General Bar Date**") was the deadline for any person or entity (excluding governmental units) holding a claim or interest against the Debtors that arose or was deemed to have arisen prior to the Petition Date, including secured claims, unsecured priority claims (including, without limitation, claims entitled to priority under sections 507(a)(4) and (5), and 503(b)(9) of the Bankruptcy Code) and unsecured nonpriority claims, to file proof of such claim or interest.  In addition, pursuant to the General Bar Date Order, July 1, 2012 at 5:00 p.m. (prevailing Eastern time) was the deadline for governmental units, as defined in section 101(27) of the Bankruptcy Code, to file proof of any claim against the Debtors that arose or was deemed to have arisen prior to the Petition Date.

---

[5]      For the avoidance of doubt, the liens, claims and interests of the Prepetition First Lien Agent and the Prepetition First Lien Lenders shall extend to the Holdback Amount, and to the extent that any portion of the Holdback Amount is not used by the Debtors for the payments set forth in paragraph 39 hereof, such remaining amounts shall be remitted to the Lender Trustee in accordance with paragraph 32 of the Coach USA Sale Order.

45.    On January 2, 2013, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105(a) and 503 and Fed. R. Bankr. P. 2002 and 9007 (I) Setting Bar Date for Filing Proofs of Claim Asserting Administrative Expenses and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 1324] (the "**Administrative Expense Bar Date Order**").  Pursuant to the Administrative Expense Bar Date Order, February 4, 2013 at 5:00 p.m. (prevailing Eastern time) (the "**Administrative Expense Bar Date**") was the deadline for any holder of an Administrative Expense[6] against any of the Debtors to file a request for payment of such Administrative Expense.

## RELIEF REQUESTED

46.    By this Motion, the Debtors request entry of an order (i) approving the Trust Agreements, (ii) authorizing and directing the Debtors to transfer the Remaining Assets to the Lender Trust, (iii) dismissing the Debtors' Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code and (iv) granting the related relief requested herein.

## BASIS FOR RELIEF

**A.    This Court Must Dismiss These Cases if the Elements for "Cause" are Shown Under Section 1112(b)(4) of the Bankruptcy Code.**

47.    Pursuant to section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause."  Section 1112(b)(1) states, in pertinent part:

---

[6]    As used in the Administrative Expense Bar Date Order, the term "**Administrative Expense**" means, as to or against any of the Debtors, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, that (x) arises under section 503(b)(1) through (8) of the Bankruptcy Code (excluding, for the avoidance of doubt, claims arising under section 503(b)(9)), and (y) first arose on or after January 3, 2012 (the Petition Date), through and including January 4, 2013.

> on request of a party in interest, and after notice and a hearing,
> absent unusual circumstances specifically identified by the court
> that establish that the requested conversion or dismissal is not in
> the best interests of creditors and the estate, the court shall convert
> a case under this chapter to a case under chapter 7 or dismiss a case
> under this chapter, whichever is in the best interests of creditors
> and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 changed the statutory language with respect to conversion and dismissal from permissive to mandatory.[7] *See* H.R. Rep. 109-31 (I), 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also In re Gateway Access Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal such that this Court has no choice, and no discretion in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)") (emphasis added).

48.     The amendments to section 1112 thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause. *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D.Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or

---

[7]     Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Small Business Admin. v. Preferred Door Co. (In re Preferred Door Co.)*, 990 F.2d 547, 549 (10thCir. 1993) (a court has broad discretion to dismiss a bankruptcy case); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); *In re Koerner*, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under section 1112(b)).

dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D. S.C. 2007).

49.    For reasons more fully explained below, this Court must dismiss the Chapter 11 Cases because cause exists and dismissal is in the best interests of the Debtors, the Debtors' estates and their creditors.

**B.    Cause Exists to Dismiss the Debtors' Bankruptcy Cases Because the Debtors Ceased their Business Operations, Have No Assets Available for Distribution and are Unable to Confirm a Liquidating Plan.**

50.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of 16 grounds for dismissal.    11 U.S.C. § 1112(b)(4)(A)-(P).    *See In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not."); *accord In re Frieouf.*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b)'s list is non-exhaustive).[8]    One such ground is where a party-in-interest shows that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

51.    To demonstrate a continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, a debtor must establish: (i) that there has been a diminution of value of the estate; and (ii) the debtor does not have a "reasonable

---

[8]    In *In re TCR of Denver*, the court recognized the apparent typographical error in § 1112(b)(4) of the Bankruptcy Code.    The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O).    Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court.    The *TCR* court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case be converted or dismissed.    *See In re TCR of Denver*, 338 B.R. at 498.

likelihood of rehabilitation." *See, e.g., In re Citi-Toledo Partner*s, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("Section 1112(b)(1) contemplates a "two-fold" inquiry into whether there has been a "continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation") (citing *In re Photo Promotion Associates, Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985)).

52.     Under the two-fold inquiry, the Debtors must first demonstrate that there has been a diminution of value of these estates. *See, e.g., In re Citi-Toledo Partners*, 170 B.R. at 606 (finding that accumulation of real estate taxes impaired the value of the estate). Second, the Debtors must demonstrate that they have no "reasonable likelihood of rehabilitation." *See, e.g., Clarkson v. Cooke Sales And Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (dismissal warranted where "the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation"); *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.)*, 749 F.2d 146 (2nd Cir. 1984) (conversion under section 1112(b)(1), (2) and (3) warranted in light of debtors' "failure . . . to demonstrate that their prospects for prompt rehabilitation were based upon anything more substantial than [their] boundless confidence" in the 15 months after the filing of a chapter 11 petition); *see also In re Wright Air Lines, Inc.*, 51 B.R. 96, 99 (Bankr. N.D. Ohio 1985) (stating that "[r]ehabilitation as used in 11 U.S.C. Section 1112(b)(1) means 'to put back in good condition; re-establish on a firm, sound basis'") (citation omitted).

53.     Here, the Debtors easily satisfy the two-fold inquiry. First, the Debtors liquidated virtually all of their assets through a number of sale transactions described above. The Debtors no longer conduct any business and have no remaining assets that could be used to satisfy the claims of any class of creditors other than the General Unsecured Creditors (as defined in the Final DIP Order) as required by the Final DIP Order and the Prepetition First Lien Lenders as required by the Coach USA Sale Order. Meanwhile, administrative claims, such as professional fees and United States Trustee fees, continue to accrue each day the Chapter 11 Cases remain open, further eroding the position of the Prepetition First Lien Lenders. Second, it

is simply impossible for the Debtors to rehabilitate their businesses since there is no business to reorganize.  Pursuant to the sale orders described above, the Debtors have transferred all of their operating assets to various purchasers and have ceased operations.

54.    Moreover, while no longer an enumerated ground under amended section 1112, dismissal of a chapter 11 case is appropriate where the court finds that a feasible plan is not possible.  *In re 3 Ram*, 343 B.R. at 117-18.  If a chapter 11 debtor cannot achieve a reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses, or delaying creditors in the exercise of their nonbankruptcy law rights.  *Id.* at 118 (citing, *inter alia*, *In re Brown*, 951 F.2d at 572).

55.    Here, the Debtors do not have sufficient assets to confirm a plan of reorganization or liquidation because the Debtors no longer have any operations and have no funds or unencumbered assets to make all of the payments that would be required to be made under a plan.  As of the date of this Motion, all of the remaining proceeds from the sales remain in the Wind-Down Carve Out Account, and such proceeds are required to be paid to the Prepetition First Lien Agent.  *See* Coach USA Sale Order ¶ 33.  Further, the Debtors are obligated, pursuant to the Coach USA Sale Order, to pay to the Prepetition First Lien Agent any proceeds they receive from the sale or other monetization of any of the Debtors' remaining assets.  *Id.*at ¶ 32.

56.    Accordingly, pursuant to the Coach USA Sale Order, the only things the Debtors may do are transfer the remainder of the GUC Trust Funds to the GUC Trustee, transfer the Remaining Assets to the Lender Trustee, to be held in trust for the Beneficiary (as defined in the Lender Trust Agreement) subject to the terms of the Lender Trust Agreement, and pay the Holdback Amount in accordance with paragraph 39.  Thus, there is no point in incurring additional administrative expenses when the Debtors are unable to consummate a plan.

57.    In sum, the Debtors have met their burden and the Chapter 11 Cases should be dismissed under section 1112(b)(4) of the Bankruptcy Code due to the substantial or

continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation and the fact that a proposed plan is not feasible.

C.     **Dismissal is in the Best Interests of the Debtors' Creditors and Estates.**

58.    Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must evaluate whether dismissal is in the best interests of the debtor's creditors and of the estate. *See, e.g., Rollex Corp. v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert").  A variety of factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss the Chapter 11 Cases.

59.    First, a dismissal of a chapter 11 bankruptcy case meets the best interests of creditors test where a debtor has nothing to reorganize, and the debtor's assets are fixed and liquidated. *See Camden Ordinance Mfg. Co. of Ark., Inc. v. Unites States Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased business was unfeasible); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).  As explained above, the Debtors have nothing left to reorganize.  As of the date of this Motion, virtually all of the operating assets of the Debtors' estates have been liquidated.  As set forth above, the only things remaining for the Debtors to do are to transfer the remainder of the GUC Trust Funds to the GUC Trustee, transfer the Remaining Assets to the Lender Trustee and pay the Holdback Amount in accordance with paragraph 39.  Thus, it is in the best interests of the creditors to dismiss the Chapter 11 Cases because the Debtors' operations no longer exist, no funds are available to finance a plan of liquidation and no assets (other than the Holdback Amount) are available for distribution other than to the GUC Trust and the Lender Trust.

60.    <u>Second</u>, the best interests of creditors test is also met where an interested party, other than the debtor, feels that dismissal is a proper disposition of the case.  *See Camden Ordinance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. ED. Pa. 1995) (Factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7, where debtor and United States Trustee both favored dismissal).  Here, the Prepetition First Lien Agent and the Creditors' Committee are supportive of the Debtors' decision to dismiss the Chapter 11 Cases.

61.    <u>Third</u>, the best interests of creditors test is met where a debtor demonstrates the ability to oversee its own liquidation.  *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("[o]nly when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation … should a debtor be permitted to remain in bankruptcy").  Here, the Debtors conducted the sale of substantially all of their assets through an extensive sale process that maximized the value of their assets and liquidated the Debtors' assets in an orderly fashion.  As recognized by this Court, this process was well-handled by the Debtors.  Transcript of Hearing, Mar. 5, 2013 at 8:20-24 ("[Y]ou have done a beautiful job in dealing with the claims, and resolving the remaining items. So it has been a very, very smoothly and well-handled case, and I am grateful to all of you.").  This process is now complete and the Debtors are confident that that there is nothing further to pursue in these Chapter 11 Cases.

62.    <u>Fourth, and finally</u>, dismissal of the Chapter 11 Cases will maximize the value of the Debtors' estates because the alternative -- conversion to a chapter 7 liquidation and appointment of a trustee -- is unnecessary and could impose significant additional administrative costs upon the Debtors' estates.  Under the circumstances, even in a chapter 7 liquidation, the chapter 7 trustee would still have no assets with which to pay any administrative expenses or other claims because the sole beneficiary would be the Prepetition First Lien Lenders pursuant to the Coach USA Sale Order.  By continuing in bankruptcy, the Debtors would just incur additional administrative expenses that they would be unable pay.

63.      Thus, in balancing the equities of the Debtors' cases, therefore, it is clear that is in the best interest of the Debtors' estates and their creditors to dismiss the Chapter 11 Cases.

64.      This Court and other bankruptcy courts in the District and Circuit have dismissed cases pursuant to section 1112(b) under similar circumstances, where the debtor lacks sufficient funds to confirm a chapter 11 plan and/or where the costs associated with plan confirmation would eliminate the possibility of a meaningful creditor recovery. *See, e.g.*, *In re G.I. Joe's Holding Corp.*, Case No. 09-10713 (KG) (Bankr. D. Del. Mar. 10, 2011) [Docket No. 753, 773, 804]; *In re CFM U.S. Corp.*, Case No. 08-10668 (KJC) (Bankr. D. Del. Feb. 1, 2010) [Docket No. 1282]; *In re Foamex Int'l Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Jan. 20, 2010) [Docket No. 761]; *In re Alternative Distribution Systems, Inc.*, Case No. 09-13099 (PJW) (Bankr. D. Del. Dec. 1, 2009) [Docket No. 213]; *In re KB Toys, Inc.*, Case No. 08-13269 (KJC) (Bankr. D. Del. Dec. 1, 2009) [Docket No. 914]; *In re Wickes Holdings, LLC*, Case No. 08-10212 (KJC) (Bankr. D. Del. May 11, 2009) [Docket No. 1418]; *In re Magnolia Energy L.P.*, Case No. 06-11069 (MFW) (Bankr. D. Del. Feb. 12, 2007) [Docket No. 196]; *In re New Weathervane Retail Corp.*, Case No. 04-11649 (PJW) (Bankr. D. Del. Sept. 4, 2005) [Docket No. 566]; *In re Princeton Ski Shop*, Case No. 07-26206 (MS) (Bankr. D. N.J. Dec. 23, 2008) [Docket No. 546]; *In re Blades Board and Skate, LLC*, Case No. 03-48818 (Bankr. D. N.J. June 29, 2004) [Docket No. 126]. The Final DIP Order, Coach USA Sale Order and Dismissal Order represent the parties' cooperative efforts at reaching a solution that benefits all of the creditors within the confines of the Bankruptcy Code. Authorizing distribution of the Remaining Assets and allowing dismissal of the Debtors' Chapter 11 Cases simply furthers the Bankruptcy Code's goal of efficient administration of the Debtors' bankruptcy estates, eliminates the accrual of administrative expense obligations and brings closure to these cases in a timely manner.

**RELATED RELIEF**

65.     In connection with the dismissal of the Chapter 11 Cases and transfer of the Remaining Assets, the Debtors request that the Proposed Order provide that, from and after the date of the order ultimately entered, none of the Debtors, nor the Prepetition First Lien Agent, nor the Prepetition First Lien Lenders, and none of the Debtors', Prepetition First Lien Agent's, or Prepetition First Lien Lenders' respective present or former directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall have or incur any liability to any person for any act taken or omitted to be taken in connection with or related to the formation, preparation, dissemination, implementation, confirmation or consummation of this Motion or the order ultimately entered (other than an action in contravention of this Motion or the implementation of the order ultimately entered), or any contract, instrument, release or agreement or document created or entered into, or any other act taken or omitted to be taken in connection with this Motion or the order ultimately entered.

66.     In addition, the Debtors also request that the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Lender Trustee, the Lender Trust and the Creditors' Committee, and the respective present or former officers, directors, employees, members, attorneys, consultants, advisors and agents of the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Lender Trustee, the Lender Trust and the Creditors' Committee, be released from any and all claims of whatever kind or nature of the Debtors, the Creditors' Committee, creditors of the Debtors' estates or any other party in interest in these Chapter 11 Cases, such that, except as may be set forth in the Proposed Order, all creditors and other parties are barred from pursuing any remedies that they have with respect to claims against any Debtor, or against any third party as such claims relate to any Debtor.

67.     Finally the Debtors request that, notwithstanding section 349 of the Bankruptcy Code, all prior Orders of this Court entered in the Chapter 11 Cases shall remain in full force and effect and shall survive the dismissal of the Chapter 11 Cases.

**NOTICE**

68.    No trustee or examiner has been appointed in the Chapter 11 Cases. Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of Delaware, Attn: Tiiara Patton, Esq.; (ii) counsel to JPMorgan Chase Bank, N.A., as the Prepetition First Lien Agent; (iii) counsel to the Creditors' Committee; (iv) all creditors of the Debtors; and (v) all parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

      **WHEREFORE**, the Debtors respectfully request entry of an order, substantially in the form submitted herewith, granting the relief requested herein and such other and further relief as this Court deems just and proper.

                        Respectfully submitted,

                        **LOWENSTEIN SANDLER LLP**
Sharon Levine, Esq.
S. Jason Teele, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
slevine@lowenstein.com
steele@lowenstein.com
nstefanelli@lowenstein.com

                          - and -

                        **POLSINELLI SHUGHART**

                        */s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

                        *Counsel to the Debtors and Debtors in Possession*

Dated: April 17, 2013
       Wilmington, Delaware